**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 694 CAP |
| | : | |
| Appellant | : | Appeal from the Order entered on |
| | : | 12/30/2013 in the Court of Common |
| | : | Pleas, Criminal Division of Philadelphia |
| v. | : | County at Nos. CP-51-CR-0417523- |
| | : | 1992, CP-51-CR-0417792-1992 and |
| | : | CP-51-CR-0418063-1992 |
| CHRISTOPHER WILLIAMS, | : | |
| | : | SUBMITTED: January 20, 2016 |
| Appellee | : | |

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 695 CAP |
| | : | |
| Appellee | : | Appeal from the Order entered on |
| | : | 12/30/2013 in the Court of Common |
| | : | Pleas, Criminal Division of Philadelphia |
| v. | : | County at Nos. CP-51-CR-0417523- |
| | : | 1992, CP-51-CR-0417792-1992 and |
| | : | CP-51-CR-0418063-1992 |
| CHRISTOPHER WILLIAMS, | : | |
| | : | SUBMITTED: January 20, 2016 |
| Appellant | : | |

*Justice Donohue delivers the Opinion of the Court, joined by Justices Baer, Todd and Wecht, except in the treatment of the claim premised upon the post-conviction testimony of Charles Wetli, MD, as to which Justice Donohue issues an opinion joined by Justices Baer and Todd. Justice Wecht files a concurring opinion concerning the treatment of the claim involving Dr. Wetli. Chief Justice Saylor files a concurring opinion, in which Justice Dougherty joins.*

## OPINION

**JUSTICE DONOHUE**                                        **DECIDED: July 19, 2016**

Pending before the Court are two appeals from the order entered in this capital case by the Philadelphia County Court of Common Pleas granting Christopher Williams ("Williams") a new trial pursuant to the Post Conviction Relief Act, 42 Pa.C.S.A. §§ 9541-9546 ("PCRA").[1]  The first, filed by the Commonwealth, challenges the grant of relief on both substantive and procedural grounds.  The second, filed by Williams, is a protective cross-appeal challenging various unfavorable determinations made by the PCRA court on other claims he raised in his PCRA petitions.  After careful review, we conclude that the record and the law support the PCRA court's findings that direct appeal counsel rendered ineffective assistance to Williams, and therefore affirm.

## I. Facts

In the summer of 1993, Williams and two codefendants, Theopolis Wilson (also referred to as "Binky" at trial) and Rick Bennett, appeared before a jury, each facing numerous charges related to the shooting deaths of Philadelphia cabdriver William Graham and three young men from New York -- Otis Reynolds, Gavin Anderson and Kevin Anderson.[2]  James White, a purported eyewitness and accomplice to the murders, testified that Reynolds and the Anderson brothers were in Philadelphia to purchase two AK-47s from Williams.  According to White, Williams was the leader of a gang that sold drugs and guns; White was a junior member.  N.T., 7/26/1993, at 13, 50-51.  Unbeknownst to the victims, the arms deal was a ruse, and Williams planned to rob them when they met.  Id. at 50.  White testified that he stole a dark colored van at Williams' request to aid in the robbery plan.  Id. at 49-50.  Williams had a duffle bag full

---

[1]  This Court has exclusive jurisdiction over appeals from PCRA decisions in death penalty cases.  42 Pa.C.S.A. § 9546(d).

[2]  The jury acquitted Williams of Graham's murder.  N.T., 8/6/1993, at 82.  We therefore omit from our recitation of the facts evidence presented at trial regarding Graham's death.

of guns stashed in a closet at his girlfriend's house, which he passed out to the members of his gang participating in the robbery. Williams gave White a shotgun, Bennett a .357 automatic weapon and kept for himself what White described as an "[uzi] type of handgun," as well as the .9 millimeter gun he "always" carried. Id. at 53-54.

According to White, on September 25, 1989, shortly after the victims arrived at the designated location for the sham gun sale, Williams, Wilson, Bennett, White and other members of the gang reportedly held them at gunpoint and demanded money. Id. at 56-57. Upon receiving from one of the victims the $2400 brought to make the gun purchase, Williams continued to demand more money. Id. at 57-58. One of the three victims ultimately confessed that there was more money at another location, prompting Williams, Bennett and a third person, known to White only as "Steve," to take that victim in the stolen van to obtain the money, leaving White, Wilson and a third gang member (whose name White did not know) to guard the remaining two victims.[3] Id. at 59-60.

White testified that Williams and his cohorts returned approximately thirty minutes later without the victim they had taken with them. Id. at 60-61. When White inquired about the missing victim, Bennett allegedly informed him that Williams shot the victim in the head. Id. at 62.

Upon his return, Williams demanded more money from the two remaining victims, and they responded that there was none. Id. at 62-63. Williams instructed Wilson and Steve to "get a Cadillac," while Williams, White, Bennett, the other, unnamed gang member and the two victims got into the stolen van. Id. at 63. The unnamed gang member drove the van, White rode in the front seat and Williams and Bennett rode in the cargo area with the two victims. Id.

---

[3] It remains unknown which victim suffered which fate, as White did not testify to the names of the individuals when recounting what allegedly occurred.

According to White's testimony, the van followed behind the Cadillac through and around Philadelphia while Williams and Bennett continued to interrogate the victims about money. Id. at 63-64. The victims repeatedly denied the existence of additional money. Id. at 64. White then allegedly observed Williams pull out his gun and shoot one of the victims "in the face" two or three times while "[t]he man was looking directly at [] Williams[.]" Id. In a statement given to police about the murders, White specified that the second victim (the first of the two victims shot in the van) was "the smallest guy" and that Williams shot him while he looked at both Williams and Williams' gun. Trial Exhibit D-10 (Interview of James White, 11/4/1991).[4] The victim slumped over in the van. A short time later, the van slowed (but did not stop), and Bennett and Williams "threw," "tossed," or "pushed" him out of the van onto the street. N.T., 7/26/1993, at 65, 202-03, 207, 266, 274. Although his description of how this victim was removed from the van was not entirely consistent, White agreed with the characterization by Bennett's defense counsel that "one had [the victim's] hands and one had his legs and they just threw him out into the street"; they "[f]ired him right out the back." Id. at 274-75.

White testified that he then observed Williams put his gun to the face of the third victim. White turned away, hearing two gun shots and the back of the van open. Id. at 66. When White turned back, the third victim was gone. Id. White presumed that, like the second victim, Williams and Bennett threw the third victim out of the van. Id. Williams was unsure whether the van ever traveled onto the sidewalk, but he testified,

---

[4] The Commonwealth inaccurately asserts that this police statement was never introduced into evidence at trial. The record reflects that this statement was introduced into evidence by Wilson's defense counsel as Exhibit D-10. *See* N.T., 7/29/1993, at 112. Defense counsel for all three defendants cross-examined White extensively on other statements he gave to the police, but for reasons unknown, never brought out the fact that White told police that Williams shot the "smallest" victim in the face while that victim looked at Williams and Williams' gun.

without qualification, that the van remained on the street and was moving when the second victim was thrown from the van. Id. at 202-03, 304.

A police witness testified that he responded to the location of Reynolds' body, on a cobblestone driveway in a residential neighborhood, in the early morning hours of September 26, 1989. N.T., 7/22/1993, at 110-11. Reynolds was on his back, with his feet on the curb and his head pointed away from the street, his head resting on a bandana or kerchief, which, according to the witness, appeared to have originally been around Reynolds' head or neck. Id. at 111-12, 119. He had sustained two gunshot wounds to the left side of his face near his left ear, approximately three quarters of an inch apart. N.T., 7/28/1993, at 146-47.

At 7:22 a.m. the same day, police were notified about the discovery of Kevin Anderson's body, located approximately a mile and a half away from Reynolds, lying face down on the sidewalk. N.T., 7/22/1993, at 122, 125-26. He had been shot twice -- once in the back of the head, once on the left side of his head. N.T., 7/29/1993, at 5.

A couple of hours later, police came to the location of Gavin Anderson's body, located approximately a half mile from his brother, lying on his stomach in a parking area about fifteen feet away from the street. N.T., 7/22/1993, at 130, 135. He had been shot three times -- in the right cheek, the right temple, and the back of the neck. Id. at 131; N.T., 7/28/1993, at 150-51.

Apart from a healing gunshot wound observed on Gavin Anderson that predated his death, none of the victims had any other injuries on their bodies. Id. at 150, 154; N.T., 7/29/1993, at 7-8. Dr. Paul J. Hoyer, Assistant Medical Examiner for Philadelphia, testified that whether a person would sustain additional injuries (scrapes, bruises, abrasions, contusions) resulting from a fall after a shooting would depend on the type of surface upon which the person fell, the speed at which they were traveling (e.g., if they

were running at the time they were shot), and whether the surface was wet or dry. N.T., 7/28/1993, at 157. If a person was running when shot, for example, Dr. Hoyer stated that he would expect to see abrasions on the body from the fall. Id. at 164. According to Dr. Hoyer, the absence of non-gunshot injuries on a body that fell after being shot means only that the body "did not fall against a hard surface with a lot of force." Id. at 162. The trial court precluded defense counsel from posing a hypothetical question regarding whether Dr. Hoyer would expect to see additional injuries to a body that was thrown or pushed onto concrete from a moving van after being shot. Id. at 161-67. According to the trial court, there were "too many variables" to allow Dr. Hoyer to answer that question. Id. at 163.

Dr. Ian Hood, Deputy Medical Examiner for Philadelphia, testified that it is not uncommon for a person who is shot and killed while standing to sustain minor abrasions, bruises or lacerations on his "bony prominences" when he collapses or falls. N.T., 7/29/1993, at 23-24. Dr. Hood testified, however, that the absence of such injuries did not mean that the victim did not fall. Id. at 24. The third Commonwealth expert, Dr. Hygow Park (the Assistant Medical Examiner for Philadelphia who performed the autopsy of Kevin Anderson), was not asked any questions on this subject.

## II. Procedural History

On August 6, 1993, the jury convicted Williams of three counts of first-degree murder and related offenses for which he received three consecutive death sentences.[5] Trial counsel, Lee Mandell, Esquire, filed a post-sentence motion raising challenges to the weight and sufficiency of the evidence. Prior to the trial court deciding that motion,

---

[5]  The jury also convicted Wilson of three counts of first-degree murder and related charges, but acquitted Bennett of all charges except for one count of corrupt organizations. See N.T., 8/6/1993, at 71-74, 76-80.

Williams requested and was granted the appointment of new counsel, Geoffrey V. Seay, Esquire, who filed an additional post-sentence motion on Williams' behalf.[6] The trial court denied the motions. While this case was pending on direct appeal, this Court entered a per curiam order removing Attorney Seay and remanding the case for the appointment of new appellate counsel.[7] Thereafter, the trial court appointed David Rudenstein, Esquire, who filed a brief in support of Williams' appeal. On October 2, 1998, this Court affirmed Williams' judgment of sentence. Commonwealth v. Williams, 720 A.2d 679 (Pa. 1998) ("Williams I"), *cert. denied*, 526 U.S. 1161 (1999).

Williams subsequently filed a timely PCRA petition raising twenty-four claims. Of relevance here, Williams asserted therein that trial counsel was ineffective for failing to properly cross-examine the Commonwealth's experts or call a forensic expert in defense, as the physical evidence did not align with White's testimony about how the shootings occurred and their aftermaths. PCRA Petition, 10/31/2000, ¶¶ (I)(A)(1), (3). Williams proffered Dr. John Smialek as an expert in forensic pathology, who Williams stated would testify "to a reasonable degree of medical certainty that the physical

---

[6] Our review of the certified record on appeal in this case reveals that Attorney Seay's post-sentence motion was not included therein and no notation of its filing appears in the lower court's docket. Williams concedes that the motion was filed.

[7] This Court further instructed "that the trial court is not to authorize payment of any petition submitted by [Attorney Seay] for services while the case was on appeal and that counsel is to be stricken from the list of attorneys eligible for court appointments in that court," and ordered the prothonotary of this Court to refer Attorney Seay to the Disciplinary Board. Order, 9/16/1996. It is also worth noting that the record reflects that Attorney Seay repeatedly failed to appear for argument on Williams' post-sentence motions, and on January 25, 1995, the trial court issued a rule upon Attorney Seay to show cause why he should not be held in contempt on that basis. Attorney Seay eventually appeared for argument, and the trial court denied relief. Additionally, following the filing of the direct appeal in this matter, Attorney Seay failed to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), as ordered by the trial court. *See* Trial Court Order, 4/21/1995; Trial Court Opinion, 4/24/1996, at 1.

evidence does not correspond with Mr. White's version of events"; that "he would expect to see contusions, abrasions or bruises" if the victims had been thrown from a moving van as testified to by White; and "that the wounds suffered by the victims are not consistent with [] White's description of how the shootings occurred." Id., ¶ (I)(A)(3)(41). Williams further averred that direct appeal counsel was ineffective for failing to raise a claim of trial court error in limiting cross-examination of the Commonwealth's expert witnesses regarding the absence of non-gunshot-related injuries on the victims' bodies. Id., ¶ (I)(A)(2).

The PCRA court summarily denied relief as to these claims and twenty-one others, but granted Williams relief as to one -- that direct appeal counsel was ineffective for failing to challenge Williams' corrupt organizations conviction pursuant to Commonwealth v. Besch, 674 A.2d 655 (Pa. 1996), *superseded by statute*, 18 Pa.C.S.A. § 911(h)(3), *as amended*, June 19, 1996, imd. effective,[8] decided during the pendency of Williams' direct appeal, which the PCRA court concluded would have resulted in this Court vacating that conviction. Commonwealth v. Williams, 936 A.2d 12, 16 (Pa. 2007) ("Williams II"). The PCRA court found that this entitled Williams to a new trial, as the evidence admitted in support of the corrupt organizations charge was highly prejudicial and inadmissible in the absence of that charge. Id. at 17.

The Commonwealth appealed the PCRA court's decision, and Williams filed a protective cross-appeal challenging the dismissal of his remaining PCRA claims. This

---

[8]  In Besch, this Court held that the corrupt organizations statute applied only to legitimate businesses that were infiltrated by crime, not to the operation of wholly illegal operations, such as the gang activity alleged in the case at bar. Besch, 674 A.2d at 659. Approximately two weeks after we published our decision in Besch, the Pennsylvania Legislature amended the corrupt organizations statute to expressly include "legitimate as well as illegitimate entities and government entities." 18 Pa.C.S.A. § 911(h)(3), *as amended*, June 19, 1996, imd. effective.

Court affirmed the PCRA court's finding that appellate counsel was ineffective for failing to raise the Besch claim and agreed that Williams' corrupt organizations conviction must be vacated. Id. at 26. We disagreed, however, that this entitled Williams to a new trial, concluding, in relevant part, that the other crimes evidence admitted in support of Williams' corrupt organizations charge was also admissible under Pennsylvania Rule of Evidence 404(b)(2) in support of the charge of criminal conspiracy. Id. at 31, 34-35; *see* Pa.R.E. 404(b)(2) (evidence that the defendant committed other crimes, wrongs or acts is admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident" if the probative value of the evidence outweighs its potential to unfairly prejudice the defendant).

We further determined that remand was necessary based upon PCRA counsel's failure to properly layer Williams' remaining claims of ineffective assistance of counsel pursuant to Commonwealth v. McGill, 832 A.2d 1014 (Pa. 2003),[9] and the PCRA court's

---

[9] Direct appeal in this case occurred prior to our decision in Commonwealth v. Grant, 813 A.2d 726 (Pa. 2002), wherein we held, "as a general rule, a petitioner should wait to raise claims of ineffective assistance of trial counsel until collateral review." Id. at 67; *see also* Commonwealth v. Holmes, 79 A.3d 562, 577-80 (Pa. 2013). Thus, at the time of the direct appeal taken in Williams' case, he was required to raise all claims of ineffective assistance of counsel at the earliest opportunity, i.e., when he was first represented by new counsel. Commonwealth v. Fletcher, 986 A.2d 759, 773 n.16 (Pa. 2009).

Thus, because Williams was appointed new counsel to represent him on direct appeal, a claim of trial counsel's ineffectiveness, standing alone, was waived based upon Williams' failure to raise it on direct appeal, as that was his earliest opportunity to present this argument to this Court. Commonwealth v. Bracey, 795 A.2d 935, 950 (Pa. 2001). As explained infra, proof that trial counsel was ineffective is a prerequisite to satisfying a petitioner's burden of proof for a claim that appellate counsel was ineffective for not raising on direct appeal this claim of trial counsel's ineffectiveness.

In McGill, "we delineated the specific construct necessary for a petitioner to 'plead, present, and prove' the ineffectiveness of appellate counsel[] where layered claims are involved. … [W]e acknowledged that this Court had not been entirely clear concerning what a PCRA petitioner must do in order to plead and prove a layered ineffectiveness (continued…)

inadequate discussion of Williams' non-Besch claims, the latter of which "prevent[ed] this Court from conducting meaningful appellate review." Williams II, 936 A.2d at 36-37. We therefore affirmed the PCRA court's order vacating Williams' corrupt organizations conviction, reversed the remainder of the order, remanded the matter to the PCRA court and relinquished jurisdiction. Id. at 37.

On remand, after receiving several extensions of time from the PCRA court, Williams filed an amended PCRA petition on July 17, 2009, presenting arguments regarding both trial and appellate counsels' ineffectiveness. Williams also included a footnote therein indicating that Dr. Smialek had died in the years between the filing of his original PCRA petition and this Court's remand, and that a new expert would be offered to present expert testimony "that will be similar to the previously proffered testimony from Dr. Smialek." Amended PCRA Petition, 7/17/2009, at 21 n.8. The Commonwealth filed a motion to dismiss his PCRA petition on September 30, 2009, to which Williams filed a response on February 2, 2010. The Commonwealth filed an amended supplemental motion to dismiss on August 2, 2010, and Williams filed another response on November 17, 2010.

On March 24, 2011, Williams filed a pro se motion to amend or supplement his PCRA petition, claiming newly discovered evidence regarding White's testimony: that White submitted a PCRA petition in his own criminal case recanting his testimony against Williams, stating that he knew nothing about the murders for which Williams was convicted and claiming that the prosecutor instructed White to falsely implicate Williams

(…continued)
claim. Regarding such instances, we held that 'a remand to the PCRA court may be appropriate for cases currently pending in the appellate courts where the petitioner has failed to preserve, by pleading and/or presenting, a layered ineffectiveness claim in a manner sufficient to warrant merits review.'" Williams II, 936 A.2d at 36 (citing McGill, 832 A.2d at 1024).

in exchange for a promise of commutation after White served fifteen years in prison.[10] Pro Se Motion to Amend or Supplement PCRA Petition, 3/24/2011, at 1-3. On June 14, 2011, Williams filed a counseled motion to supplement or amend the PCRA petition, framing the argument raised by Williams pro se as a Brady[11] violation, and raising several other claims. There were two additional averments relevant to this appeal. First, Dr. Charles Wetli would testify as an expert forensic pathologist "that the positions in which the bodies were found, and the absence of cuts or abrasions on the decedents' skin, were not consistent with White's claim that, after being shot in the van, the victims were thrown from the back of the moving vehicle." Motion to Supplement/Amend PCRA Petition, 6/14/2011, ¶ 3. Second, Robert Tressel, "a crime scene reconstruction expert," would testify, in relevant part, that the blood flow patterns observed on the victims and the absence of non-gunshot injuries rendered the forensic evidence inconsistent with White's testimony that the victims were shot and thrown from a moving van. Id., ¶ 4.

On July 20, 2011, the Commonwealth filed a letter with the PCRA court, which that court treated as a motion to dismiss, asserting, inter alia, that the proffered testimony by Tressel constitutes "an entirely new claim" that Williams "never mentioned" in his original PCRA petition. Motion to Dismiss, 7/20/2011, at 1-2. The Commonwealth argued that the court should not allow the addition of this new claim, as the amendment constitutes a second, untimely PCRA petition[12] and is also beyond the scope of this Court's remand order. Id. at 2 (citing cases).

---

[10] At Williams' trial, White testified that he was serving six concurrent life sentences after pleading guilty to six counts of first-degree murder, including the murders of Reynolds, the Anderson brothers and William Graham. N.T., 7/26/1993, at 9-10.

[11] Brady v. Maryland, 373 U.S. 83 (1963).

[12] Subject to certain, enumerated exceptions, a PCRA petition must be filed within one year of the date a criminal defendant's judgment of sentence becomes final. 42 Pa.C.S.A. § 9545(b)(1). Under the PCRA, "a judgment becomes final at the (continued…)

On October 5, 2011, the PCRA court granted Williams an evidentiary hearing on the following claims:

> 1. [Williams'] layered ineffectiveness of counsel claim regarding the alleged failure of trial counsel to investigate, obtain, and present expert forensic testimony;
>
> 2. [Williams'] layered ineffectiveness of counsel claim regarding trial counsel's alleged failure to investigate, obtain, and present testimony from alleged alibi witness Racharlotte Townes;[13] and
>
> 3. [Williams'] claimed <u>Brady</u> violation relating to an alleged plea agreement with Commonwealth witness James White.

PCRA Court Order, 10/5/2011 (footnote added). The Commonwealth filed a motion for reconsideration on November 9, 2011, asserting that all of the issues upon which the PCRA court granted an evidentiary hearing were "first raised by [Williams] post-remand." Commonwealth's Motion for Reconsideration and Leave to Amend, 11/9/2011, ¶ 11. The Commonwealth alternatively sought the court's permission to substantively respond to Williams' PCRA claims, which the PCRA court granted. Id., ¶ 16; PCRA Court Order, 11/14/2011.

Rather than file an answer to Williams' amended PCRA petition, the Commonwealth filed another supplemental motion to dismiss, again asserting that the arguments were new and untimely raised, and that his amendments went beyond the

---

(…continued)
conclusion of direct review, including discretionary review in the Supreme Court of the United States and the Supreme Court of Pennsylvania, or at the expiration of time for seeking the review." 42 Pa.C.S.A. § 9545(b)(3).

13  At the inception of the evidentiary hearing, Williams withdrew this claim from consideration. <i>See</i> N.T., 3/11/13, at 5.

scope of this Court's remand order. *See* Commonwealth's Second Supplemental Motion to Dismiss, 11/28/2012, ¶¶ 2-5. The Commonwealth requested that the PCRA court dismiss Williams' PCRA petition without a hearing. Id., Prayer for Relief. The PCRA court did not formally rule upon the Commonwealth's motion, but on December 14, 2012, it ordered the Commonwealth to "file and serve its pre-hearing memorandum" by the date of the hearing. PCRA Court Order, 12/14/2012. The Commonwealth complied on January 10, 2013 and filed a supplemental pre-hearing memorandum on March 8, 2013.

After numerous continuances, the PCRA court held a three-day hearing beginning on March 11, 2013. Dr. Wetli, Tressel, White, White's mother, Williams' former girlfriend, trial counsel and direct appeal counsel all testified for the defense; White's attorney, Detective Richard Harris, the trial prosecutor and Dr. Samuel Gulino testified for the Commonwealth. Thereafter, and following the review of the parties' post-hearing memoranda and briefs, the PCRA court once again granted Williams relief, vacating his judgment of sentence and granting him a new trial. It based its decision upon its conclusion that trial counsel rendered ineffective assistance by "failing to investigate the medical and forensic evidence, consult with and retain experts and present expert testimony or properly cross-examine the Commonwealth's expert," and that direct appeal counsel was ineffective for not raising on direct appeal both this claim and a claim of trial court error in refusing to permit defense counsel to cross-examine the Commonwealth's experts about the absence of non-gunshot-wound injuries on the victims' bodies. PCRA Court Order, 12/30/2013, ¶¶ 2-3. The PCRA court dismissed all other claims raised in Williams' original and amended PCRA petitions.

### III. Analysis

The PCRA provides post-conviction relief to criminal defendants serving their sentence for the crime(s) at issue who prove, by a preponderance of the evidence, that their convictions or sentences resulted from at least one of the errors enumerated in Section 9543(a)(2), the claims were not previously litigated or waived, and any alleged failure to litigate or raise the claims "could not have been the result of any rational, strategic or tactical decision by counsel." 42 Pa.C.S.A. § 9543(a); Commonwealth v. Robinson, 82 A.3d 998, 1005 (Pa. 2013). This Court reviews a PCRA court's decision in the light most favorable to the prevailing party. Commonwealth v. Hanible, 30 A.3d 426, 438 (Pa. 2011). Our review is limited to a determination of whether the record supports the PCRA court's factual findings and whether its legal conclusions are free from error. Id. "A PCRA court's credibility findings are to be accorded great deference, and where supported by the record, such determinations are binding on a reviewing court." Commonwealth v. Treiber, 121 A.3d 435, 444 (Pa. 2015) (citing Commonwealth v. Dennis, 17 A.3d 297, 301 (Pa. 2011)). We review the PCRA court's legal conclusions de novo. Commonwealth v. Roney, 79 A.3d 595, 603 (Pa. 2013). We begin by addressing the issues raised by the Commonwealth in its appeal.

### A. Amendment of PCRA Petition Post-Remand

The Commonwealth first asserts that the PCRA court erred in considering Tressel's blood flow testimony, raised for the first time by Williams in his counseled motion to amend/supplement his PCRA petition following remand by this Court. The Commonwealth contends that this constituted a new claim and therefore, pursuant to

decisional law from this Court, it was prohibited.  Brief for the Commonwealth at 32; *see* PCRA Court Opinion, 12/30/2013, at 20-23, 36, 39.

Williams contends that Tressel's blood flow testimony was not offered in support of a new claim.  In his original PCRA petition, he raised the issue of trial counsel's ineffectiveness for failing to present expert testimony to show that the physical and forensic evidence was inconsistent with White's testimony regarding how the murders occurred.  Brief for Williams at 46-47.  In the alternative, Williams asserts that if this is a new claim, it was within the PCRA court's discretion to permit him to amend his PCRA petition pursuant to Rule 905 of the Pennsylvania Rules of Criminal Procedure, "as a hearing on this claim was in the interest of justice."  Id. at 47.

Despite the Commonwealth repeatedly raising this issue below, the PCRA court does not address it in its written opinion.  As this presents a question of law and is otherwise apparent from the record, our review is not impeded.

The Commonwealth is correct that, in the absence of permission from this Court, a PCRA petitioner is not entitled to raise new claims following remand from this Court for further PCRA proceedings.  *See, e.g.*, Commonwealth v. Daniels, 104 A.3d 267, 285 (Pa. 2014) (finding a new PCRA claim raised post-remand from this Court to have been waived as "[t]his Court explicitly limited the subject matter of the remand to the remaining issues already raised by appellees; we neither invited nor authorized appellees to raise additional collateral claims years after expiration of the PCRA time-bar"); Commonwealth v. Spotz, 18 A.3d 244, 328 (Pa. 2011) (denying the appellant's request for remand for the PCRA court to consider issues first raised in a motion for reconsideration, as this would amount to the PCRA court's consideration of a second,

untimely PCRA petition); Commonwealth v. Rainey, 928 A.2d 215, 226 n.9 (Pa. 2007) (stating that because this Court expressly permitted the appellant to raise only one new PCRA claim on remand, raising any additional issues post-remand was improper). Our review of the record in the case at bar reveals, however, that the addition of Tressel's blood flow testimony did not constitute the presentation of a new claim post-remand. As our recitation of the procedural history of this case reflects, the expert proffered by Williams in his original PCRA petition, Dr. Smialek, had passed away in the time between the filing of his PCRA petition and this Court's remand for Williams to file an amended PCRA petition pursuant to McGill. Thus, Williams was forced to find a new source for testimony in support of his originally filed claim -- that trial counsel was ineffective for failing to present a defense expert to identify the "compelling exculpatory evidence regarding the inconsistencies and contradictions between the physical evidence and [] White's version of events … to the jury." PCRA Petition, 10/31/2000, ¶ (I)(A)(3). Williams did just that, substituting Dr. Wetli and Tressel in place of the late Dr. Smialek.

The Commonwealth does not argue on appeal that Williams improperly substituted a new expert witness for Dr. Smialek. It raises no argument concerning the propriety of Dr. Wetli's testimony in general or Tressel's testimony in areas other than blood flow evidence. *See* Brief for the Commonwealth at 32 (assailing only the PCRA court's decision to permit Williams to present Tressel's testimony "about blood flow"). Moreover, although the Commonwealth baldly asserts that the blood flow testimony by Tressel constituted a "new claim," it fails to elucidate and develop why this particular area of testimony should be construed as such.

Our review of the PCRA filings submitted by Williams does not support the Commonwealth's bald conclusion. As discussed in detail below, Tressel's blood flow testimony was that the blood patterns observable on the victims' clothing and bodies was inconsistent with White's testimony that the victims were shot and thrown from a moving van. According to Tressel, the blood flow evidence supported only a finding that the victims were shot at the locations where they were found by police. This testimony certainly falls under Williams' claim, contained in his original counseled PCRA petition, that trial counsel failed to present exculpatory evidence highlighting contradictions between the physical evidence and White's story of what occurred. We therefore find no error in the PCRA court's decision to consider this testimony at the PCRA hearing. *See, cf.,* Commonwealth v. Elliott, 80 A.3d 415, 435-36 (Pa. 2013) (declining to find waiver of a claim "raised generally" in the petitioner's 2009 PCRA petition and then "further developed" in his 2010 supplemental brief).

## B. Ineffective Assistance of Trial Counsel[14]

The Commonwealth further challenges the PCRA court's conclusion that trial counsel was ineffective for failing to call a defense expert to testify to the inconsistencies and contradictions between White's testimony and the medical and forensic evidence. Success on a claim of ineffective assistance of counsel requires the petitioner to rebut the presumption that counsel rendered effective assistance and prove, by a preponderance of the evidence, that (1) the claim has arguable merit, (2)

---

[14] As stated supra, Williams waived an independent claim of trial counsel's ineffectiveness based upon his failure to advance it on direct appeal before this Court. Nonetheless, because it is a necessary component of our review of appellate counsel's ineffectiveness, for ease of disposition, we address the question of trial counsel's ineffectiveness first.

counsel's action or inaction was not based upon a reasonable trial strategy and (3) petitioner suffered prejudice because of counsel's act or omission. Commonwealth v. Mason, 130 A.3d 601, 618 (Pa. 2015). The failure to satisfy any one of the prongs requires rejection of the petitioner's claim. Treiber, 121 A.3d at 451.

The record reflects that Tressel, the Chief Criminal Investigator for the Cobb County District Attorney's Office in Marietta, Georgia, testified at the PCRA hearing as an expert in the field of homicide investigation, crime scene analysis and blood spatter analysis. N.T., 3/11/2013, at 7, 18. He provided his opinion, to a reasonable degree of professional certainty, that the medical and forensic evidence was inconsistent with White's testimony.[15] Id. at 21.

In his testimony, Tressel went through the evidence presented at trial, including photographs of the victims, and discussed the various reasons why the murders could not have happened the way White claimed. Beginning with Gavin Anderson, Tressel stated that the body was found in a location approximately twenty feet from the road with his legs partially underneath a vehicle parked next to him, all of which was inconsistent with the victim having been thrown from a moving vehicle. Id. at 23. There were no observable or noted tears, marks or other damage to his clothing, nor any scrapes, abrasions or bruises on his body, all of which Tressel stated he would expect to see if the body had been thrown from a van in the manner described by White,

---

[15] As stated supra, it remains unknown which two victims were allegedly shot in the van. Therefore, the experts that testified on Williams' behalf at the PCRA hearing testified regarding the possibility that any of the three victims were shot and thrown from a van.

regardless of whether the surface upon which he landed was wet or dry. Id. at 23-25, 98.

Tressel further identified pooled blood in Gavin Anderson's ear, depicted in a crime scene photograph of the victim, which he concluded was "inconsistent with being thrown from a van." Id. at 25-26; PCRA Exhibits P-3, P-4. Had this victim been thrown after being shot, "the blood should have been projected away from the ear as the movement, rolling, tossing, coming out of the car and would create a total[ly] different pattern that we don't see in this photograph." N.T., 3/11/2013, at 26. According to Tressel, the blood would have been "going in different directions, staining the face and clothing indicating movement" if the murder happened as White described. Id. at 27.

Turning to Kevin Anderson, Tressel provided the following testimony regarding the blood pattern observed:

> The majority of the blood that's at the upper top side of the sweatshirt and some blood down low, this is what we call wicking blood. It's where the materials come in contact with blood and begin to soak it up.
>
> … [Y]ou can see a blanched area which [sic] there's nothing on the center of the chest down along the abdomen, which would be consistent with the position the body was found in, being face down against the pavement.

Id. at 39; PCRA Exhibits P-10, P-11, P-12. Tressel further identified blood running down Kevin's face from the gunshot wound above his left ear, which drained down his face and underneath his body onto the ground. N.T., 3/11/2013, at 40-41. Tressel concluded that the blood patterns were not consistent with the victim being thrown from a van after he was shot, as there was an absence of "projected blood that's being thrown about as the body is being tossed from the vehicle and coming to rest by either

rolling or so forth on the clothing … ."  Id. at 39-40.  Tressel explained that blood flows gravitationally, and because there was no change in the direction of the blood flow or "remnants of the first blood flow," which would be observed if the victim was moved from one position to another after he was shot, the evidence showed that the body was shot and fell in the location it was found.  Id. at 41.

According to Tressel, it was also inconsistent with White's testimony that Kevin Anderson was found on the sidewalk without any abrasions on his body or noted damage to his clothing.  Id. at 42-43.  Tressel testified that if a body was thrown from a moving van, "[i]t would have to roll or slide to some extent to come to rest" after it hit the ground, which would result in damage to the victim's clothing and "impact injuries" to the body when it hit the ground.  Id. at 43.  Tressel further testified that Kevin Anderson was unquestionably the "smallest" victim,[16] and he had no gunshot wounds on his face, contrary to White's description to police.  Id. at 43-47.  Indeed, Tressel stated that none of the three victims were shot consistent with White's statement to police that one victim was looking "directly at Williams" and his gun when Williams shot them.  Id. at 48.

Regarding Reynolds, Tressel testified that, like the others, it was his opinion that this victim was shot in the location where the police found him.  Id. at 52-53.  Tressel believed that Reynolds was standing at the time he was shot in the back of the head, that gunshot fractured his skull and caused blood to flow from his nose and mouth to the left, down his neck and pool at the neckline of his sweatshirt.  He then fell to the ground, on his back, with his right cheek turned towards the ground, and the blood ran in that

---

[16]  Kevin Anderson was five feet, four inches tall, Gavin Anderson was five feet, eight inches tall and Reynolds was five feet, eleven inches tall.

direction, ultimately pooling underneath Reynolds on the right side. Id. at 51, 79-81, 114, 117; PCRA Exhibits P-13, P-14.[17] Tressel testified that if Reynolds had been shot in a van before being thrown onto the sidewalk, he would have had blood trailing in all directions, all over his face, as his gunshot wound to the back of his head would have rendered him without muscle control. Id. at 82-83. Further supporting this conclusion, he pointed to the kerchief resting under Reynolds' head, which Tressel stated would have fallen off if Reynolds had been thrown from a van. Id. at 52.

Tressel clarified that the victims would have started to bleed immediately upon being shot. Id. at 73-74. Thus, if any of the victims were shot in a van and then removed, as White testified, the blood flow patterns would have so indicated. Id. at 73 ("If they're in the van, they're in one position. When they're tossed out of the van, they're now going to roll and go to a second position. … [The] blood flow pattern is not there."). Even if they were shot and immediately thrown out of the van, Tressel stated the blood pattern would reflect this:

> The blood may not be on the clothing from the position in the van. But as they're being tossed out of the van, that blood is going to be projected off the body because the body is in motion.
>
> And we would expect some of that to fall on the clothing to indicate pattern and directionality. And none of these [victims] have any patterns showing directionality or anything of that nature.

---

[17] During cross-examination of Tressel, the Commonwealth was permitted to utilize a photograph of Reynolds lying on a gurney. N.T., 3/11/2013, at 77-78. The photograph was not admitted into evidence, as the Commonwealth had only recently found the photograph and did not know any requisite details to authenticate the picture. Id. at 75-76. Tressel testified that the blood flow depicted in this photograph also supported his expert opinion. Id. at 78-80, 114-17.

Id. at 74.

Dr. Wetli, the former Chief Medical Examiner for Suffolk County, New York, testified as an expert in the field of forensic pathology. Id. at 126-27. He testified, to a reasonable degree of medical and forensic certainty, that the location and the condition of the bodies and the condition of the victims' clothing were inconsistent with White's testimony that they were "thrown" or "tossed" from a moving vehicle. Id. at 130-32, 147. Dr. Wetli explained that he has experience examining bodies that were expelled from moving vehicles, and regardless of the specific details attendant to the murders (whether the bodies were pushed, tossed or thrown, the speed the van was traveling or the height of the van), he would have expected to see **some** evidence of injury to the body as a result and damage to their clothing. Id. at 133-34, 142-43. Dr. Wetli testified that, based on the principle of physics that "an object in motion stays in motion until altered by a force," if the bodies were thrown from a moving vehicle, the victims would have had "sliding abrasions," from "scraping along the pavement" once they hit the ground. Id. at 133-34. He acknowledged that it was possible for a body not to get an abrasion from sliding on the ground, but testified that in his opinion, it was highly unlikely. Id.at 142-43. According to Dr. Wetli, there was no evidence to support a conclusion that the victims were expelled from a van, and he would be "very surprised," "based on the total lack of evidence," if this was how the murders actually occurred. Id. at 145. Dr. Wetli further testified that none of the victims sustained a gunshot wound "in the face directly on." Id. at 132.

The Commonwealth presented rebuttal testimony from Dr. Gulino, Philadelphia's Chief Medical Examiner, who testified to his disagreement with the defense experts'

conclusions that the absence of visible injuries on the victims is inconsistent with a finding that they were thrown from a moving van.  N.T., 3/13/2013, at 147-50.  Dr. Gulino stated that without knowing the speed the van was traveling, the surface upon which the victims fell, whether the surface was wet or dry, and how they were expelled from the van, the absence of additional injuries or damage to the victims' clothing means nothing.  Id. at 148-49, 159-64.

Dr. Gulino conceded, however, that if the van were driving in the street when the victim was thrown out, he would have expected to see injuries caused by Reynolds landing on the cobblestone driveway.  Id. at 179-80.  Because White provided such inconsistent statements at trial about what happened -- stating in one instance that a victim was forcibly thrown by two men holding his hands and feet, and in another that the victim was simply "pushed" -- Dr. Gulino could not decipher precisely what happened.  Id. at 180-82.  If any of the victims had in fact been "projected through the air such that [he] landed on the pavement," Dr. Gulino agreed that there would have been injuries on the victims' bodies as a result.  Id. at 188.  He further admitted that none of the victims were found in locations consistent with having been "pushed" from a van that was driving in the street.  Id. at 186.

Examining photographs of the victims, Dr. Gulino opined that Gavin Anderson "collapsed straight down" after being shot.  Id. at 158; Commonwealth's Exhibit C-18.  In other words, he agreed that this victim was not thrown from a van.  Regarding Kevin Anderson, Dr. Gulino stated that although he could definitively state, based upon the blood patterns, that the body "changed positions after he was shot," he could not conclude that the body was "moved from one location to another by some other agent."

N.T., 3/13/2013, at 170, 175; PCRA Exhibit P-11. While he did not find the evidence inconsistent with the testimony that this victim was thrown from a moving van, he also agreed that the victim could have been shot in that location and then fell to the ground, as testified by Tressel. N.T., 3/13/2013, at 171, 175-76. With respect to Reynolds, Dr. Gulino was of the opinion that the blood flow evidence did not support Tressel's conclusion that he was standing and collapsed down after he was shot. Id. at 166; PCRA Exhibit P-13. According to Dr. Gulino, Reynolds would have immediately collapsed upon the severing of his spinal cord, and the pooling of blood on Reynolds' left shoulder would not have occurred that quickly. N.T., 3/13/2013, at 166.

Relative to the above-summarized testimony, the PCRA court found credible the testimony provided by Tressel and Dr. Wetli. The PCRA court also observed that much of Dr. Gulino's testimony aligned with the conclusions of Tressel and Dr. Wetli, and that in its entirety, the expert testimony rendered White's version of events incredible. PCRA Court Opinion, 12/30/2013, at 19-20, 22-24. It found that trial counsel, who admitted at the PCRA hearing that he did not consult with, let alone attempt to retain, a medical or forensic expert (he "didn't even give it a thought") was ineffective. Id. at 26-40; N.T., 3/12/2013, at 65-67. Trial counsel could have, and should have, cross-examined the Commonwealth's experts and/or called an expert to testify that, contrary to White's testimony and statements to police,

- none of the victims, including the "smallest" victim (Kevin Anderson), had a gunshot wound to the front of his face;

- the blood pattern evidence demonstrated that all three of the victims were shot in the locations where the police found them and was inconsistent with the bodies having been thrown from a vehicle;

- the absence of damage to the victims' clothes and non-gunshot-wound injuries to their bodies was wholly inconsistent with White's versions of events; and

- the location of the victims' bodies was inconsistent with any of them having been thrown from a moving van. PCRA Court Opinion, 12/20/2013, at 34-37.

Although the PCRA court acknowledged that vigorous cross-examination of the Commonwealth's expert can render unnecessary a separate defense expert, this was not the case here, as trial counsel did not attempt to speak with the Commonwealth's experts prior to trial and failed to ask a single question of these witnesses on cross-examination. Instead, trial counsel relied entirely on the (failed) cross-examinations conducted by counsel for Williams' co-defendants regarding the absence of non-gunshot-related injuries on the victims. Id. at 27, 31; N.T., 3/12/2013, at 67; *see generally* N.T., 7/28/1993, at 141-167; N.T., 7/29/1993, at 4-25. The PCRA court found that the failure of Williams' trial counsel to question the Commonwealth's experts or to call an expert of his own to testify in each of the above-identified areas resulted in prejudice to Williams and that trial counsel provided Williams ineffective assistance. PCRA Court Opinion, 12/30/2013, at 34-38.

The PCRA court determined that trial counsel's failings, both individually and collectively, prejudiced Williams, warranting the grant of a new trial. PCRA Court Opinion, 12/30/2013, at 38-39 ("Any one of the foregoing are sufficient to demonstrate prejudice. … Viewed cumulatively, the crime scene, forensic, and medical evidence do

far more than raise a reasonable doubt. As a whole, a jury could readily find that from this evidence that White lied at trial.").

The Commonwealth asserts that these findings are erroneous. It argues that this constitutes an improper hindsight evaluation of trial counsel's performance. Brief for the Commonwealth at 48. Examining trial counsel's actions from a "time-of-trial perspective," the Commonwealth contends that there is no basis for a finding of ineffectiveness. Id. at 49. Trial counsel and the other defendants' counsel pursued the strategy of discrediting White and cross-examined him on numerous inconsistencies between his testimony and multiple statements he gave to police. According to the Commonwealth, "it would not have been productive to pursue every conceivable discrepancy." Id. at 49-50. The Commonwealth asserts that the cross-examination of its experts, conducted by counsel for Williams' codefendants, provided the jury with enough information for it to disbelieve White's testimony and that trial counsel's strategy was therefore reasonable. Id. at 50-52.

Addressing the specific findings of the PCRA court, the Commonwealth challenges the PCRA court's determination that trial counsel was ineffective for failing to present evidence that none of the victims were shot in the face as White maintained. The Commonwealth asserts that "two victims -- Gavin Anderson and Otis Reynolds -- *were* shot in the face, twice each," which it states is "consistent with White's testimony" that Williams shot one of the victims "in the face." Id. at 52 (emphasis supplied). The Commonwealth asserts that there is no support anywhere in the record that White alleged that any of the victims were shot in the front of the face, and thus, counsel

cannot be deemed ineffective for failing to produce testimony to rebut a statement that was never made. Id. at 53.

The Commonwealth further contends that Williams waived any argument that the "smallest victim" (Kevin Anderson) was not shot in the face, as he did not raise this particular argument in his 2011 PCRA petition. Id. at 54. Even if not waived, the Commonwealth contends that trial counsel's cross-examination of White proved White's evaluation of the victims' statures was poor and unreliable, as White testified that all of the victims were between five feet, eight inches and six feet tall and would not hazard a guess as to Williams' height. Id. at 55.

Regarding Tressel's blood flow testimony, the Commonwealth asserts that two of the victims exhibited the blood flow changes that Tressel testified he would have expected to see if the victims had been expelled from a van. Id. at 62. The Commonwealth refers to Tressel's testimony as "a double-edged sword," as Tressel "confirm[ed] that the bullets retrieved from two victims' bodies matched the weapons" that White testified Williams and Bennett had at the time of the murders. Id. at 62-63. Thus, according to the Commonwealth, Tressel's testimony does not support a claim of ineffectiveness. Id.

Lastly, the Commonwealth argues that trial counsel was not ineffective for failing to question the Commonwealth's experts, and instead exhibited "sound legal practice," by not repetitively questioning the witnesses in areas already explored by codefendants' counsel. Id. at 56-57. According to the Commonwealth, codefendants' counsel elicited the "key facts" that Williams now claims trial counsel should have called an expert to establish, and any defense expert called could only testify "based on assumptions," as

the speed of the van and the force by which the victims were expelled remains unknown. Id. at 59-60. Moreover, during his summation, Williams' trial counsel argued to the jury that the absence of additional injuries on the victims and the locations of their bodies were inconsistent with White's version of events. Id. at 58-59.

For all of these reasons, the Commonwealth urges a finding that Williams was not prejudiced by the absence of a defense expert. The Commonwealth therefore maintains that the PCRA court erred in finding that trial counsel rendered ineffective assistance. Id. at 63-65.

Williams conversely advocates that the PCRA court's decision is factually and legally sound, as his trial counsel failed to present expert testimony or elicit testimony on cross-examination in support of the defense theory that the medical and forensic evidence did not support White's testimony about the murders. Brief for Williams at 22-34. Williams asserts that to the extent trial counsel's decision not to call an expert could be considered "strategic," it was "necessarily unreasonable," as counsel made the decision without conducting the requisite investigation and preparation. Id. at 34. Williams asserts that "the Commonwealth's arguments amount to little more than its disagreement with the findings and conclusions of the court below," which is insufficient to warrant reversal of the PCRA court's decision. Id. at 38. Because the facts adduced at the PCRA hearing support the PCRA court's findings and its legal conclusions are error-free, Williams insists that this Court must affirm. *See* id. at 34-38.

### 1. **Arguable Merit**

To satisfy the "arguable merit" prong for a claim of ineffectiveness based upon trial counsel's failure to call an expert witness, the petitioner must prove that an expert

witness was willing and available to testify on the subject of the testimony at trial, counsel knew or should have known about the witness and the defendant was prejudiced by the absence of the testimony.[18] Commonwealth v. Chmiel, 30 A.3d 1111, 1143 (Pa. 2011); Commonwealth v. Gibson, 951 A.2d 1110, 1133 (Pa. 2008). Prejudice in this respect requires the petitioner to "show how the uncalled witnesses' testimony would have been beneficial under the circumstances of the case." Commonwealth v. Sneed, 45 A.3d 1096, 1109 (Pa. 2012) (quoting Gibson, 951 A.2d at 1134). Therefore, the petitioner's burden is to show that testimony provided by the uncalled witnesses "would have been helpful to the defense." Id. (quoting Commonwealth v. Auker, 681 A.2d 1305, 1319 (Pa. 1996)).

---

[18] As stated above, the PCRA court found that Williams' trial counsel was ineffective both in his failure to investigate potential expert witnesses and in failing to call expert witnesses to testify at trial in support of Williams' defense. In its written opinion in support of its grant of a new trial, however, the PCRA court does not engage in a discussion of these factors, instead casting Williams' failure to call an expert witness to testify as a failure to conduct an appropriate investigation, and relies largely upon non-precedential case law from the federal court of appeals for the third circuit. PCRA Court Opinion, 12/30/2013, at 26-29. Because a finding that there is arguable merit to a claim of ineffective assistance of counsel ultimately constitutes a legal conclusion, which we review de novo, we review these factors in the first instance herein. See Commonwealth v. Martin, 5 A.3d 177, 199 (Pa. 2010).

Justice Wecht's concurring opinion likewise focuses upon the PCRA court's determination that Williams' trial counsel's failed to conduct a proper investigation. Although the points made by Justice Wecht may be correct concerning our review of a finding that counsel failed to investigate, our affirmance is based upon the PCRA court's conclusion that trial counsel rendered ineffective assistance in failing to call an expert witness to testify at trial. As relief is fully affordable on this basis, we do not address the additional finding of trial counsel's ineffectiveness in failing to conduct an adequate investigation. See Commonwealth v. Judge, 916 A.2d 511, 517 n.11 (Pa. 2007) (observing that this Court may affirm the decision of the lower court on any proper ground that is supported by the record).

The record reflects that both Dr. Wetli and Tressel testified that the testimony they provided at the PCRA hearing was readily available at the time of trial and could have been provided if they had been retained.[19] N.T., 3/11/2013, at 53-54, 147-48. Trial counsel was aware that a witness could testify in the areas raised by Williams in his PCRA petition, as the defense strategy was based in part upon the theory that the murders could not have occurred the way that White testified. Indeed, counsel for Williams' codefendants attempted to address some of the points in their cross-examination of the Commonwealth's experts, and trial counsel argued some of these points to the jury during his closing argument. Id. at 65, 85, 93-95. Trial counsel also testified that, at the time of Williams' trial, he was familiar with the concept of blood flow evidence. N.T., 3/12/2013, at 67.

We address whether the missing testimony would have been beneficial or helpful to Williams' defense on a witness-by-witness basis.[20] Beginning with Dr. Wetli, the sum total of his testimony was that although it was possible that the victims were shot and

---

[19] In its reply brief, the Commonwealth contends that Williams failed to establish that Tressel or another similar expert was available at the time of trial to testify to the blood flow evidence Tressel provided at the PCRA hearing. Reply Brief for the Commonwealth at 25. This is inaccurate. *See* N.T, 3/11/2013, at 53-54 (Tressel testifying that he began his consulting business in 1989 and would have been available to provide this analysis at that time).

[20] Contrary to the concern raised by Justice Wecht in his concurring opinion, we make no assessment of the credibility of the witnesses' testimony. Rather, we evaluate the entirety of the content thereof to determine if it would have been beneficial to Williams' defense under the circumstances at trial, as we are required. *See, e.g.,* Gibson, 951 A.2d at 1134 (finding that the claim of trial counsel's ineffectiveness for failing to call proffered witnesses to testify at trial was meritless because the testimony would not have been beneficial to the defense, as it was cumulative of other evidence presented, did not directly contradict the Commonwealth's trial evidence, did not preclude the defendant's involvement in the crime at issue, and the witnesses could have been impeached with their prior crimen falsi convictions).

thrown from a moving van, in his view, this was improbable, as there was no evidence to suggest that this is what occurred. While Dr. Wetli's phrasing of his testimony on direct would have been helpful to Williams' defense, the Commonwealth's cross-examination left very little force to his opinion. Dr. Wetli's opinion was based solely on the absence of non-gunshot injuries on the victims' bodies or damage to their clothing, but he conceded that it was "difficult to say with any degree of certainty what should have occurred with regard to the bodies." N.T., 3/11/2013, at 145. In particular, because there was no information pertaining to "the speed of the van," and because "[t]he slower the van is moving, obviously the less injury you're going to be getting," he could only conclude that although it was "possible," he believed it "very unlikely" that the murders occurred the way White testified. Id. at 143, 145.

The substance of Dr. Wetli's testimony was largely presented on cross-examination of the Commonwealth's experts by counsel for Williams' codefendants at trial. See N.T., 7/28/1993, at 157, 162 (Dr. Hoyer testifying that the absence of non-gunshot injuries was dependent upon several factors, and only meant that the victims "did not fall against a hard surface with a lot of force"); N.T., 7/29/1993, at 23-24 (Dr. Hood testifying that non-gunshot injuries from a fall, while possible, did not preclude a finding that the victim fell after he was shot). Moreover, it is doubtful that Dr. Wetli's testimony would have been admissible as expert testimony at trial. Pennsylvania Rule of Evidence 702 provides that a witness so qualified may testify as an expert if: "(a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson; (b) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in

issue; and (c) the expert's methodology is generally accepted in the relevant field."

Pa.R.E. 702. Taking nothing away from Dr. Wetli's experience and expertise, the record reflects that his testimony amounted only to his conclusion that a person thrown onto the sidewalk from a van that is driving fast enough down the street would likely sustain injuries and damage their clothing. That is not something that is beyond the grasp of the average layperson. In fact, the record reflects that trial counsel argued this point to the jury, advocating that it was a matter of common sense:

> What about the bodies, and what happened with the bodies? Now, here, again, you've got to use your common sense and you've got to think.
>
> A body is being tossed -- I'm not going to demonstrate. You draw your own conclusions -- tossed, thrown, deposited, whatever word you want to use, out of the van. Was the van moving when it happened? Yes. How fast? We don't know. But if you believe it happened that way, a body is ejected from a moving van, hits the street, what is going to happen? Doesn't your common sense tell you that you would expect to see some type of bruising? I'm not talking about large cuts, necessarily, but some type of bruising, abrasions, concussions [sic], something of that sort. Nothing on these bodies.
>
> And what about where the bodies are found? Mysteriously, there is no body found in the street. There is only one body that is found, with some portion of it extending over a curb line. You had two bodies found on the sidewalk, and you had one body found some distance away from the curb line.
>
> What do they do, ladies and gentlemen, bounce, get up and walk over there? Come on, you've got to think. This is what James White would have you believe[.]

N.T., 8/3/1993, at 43-44.

Furthermore, it is unclear what Dr. Wetli meant when he testified that no victim was "shot in the face directly on." N.T., 3/11/2013 at 132. It appears that this

conclusion is unsupported by the record. As stated by the Commonwealth, two of the victims, Gavin Anderson and Reynolds, were shot "directly on" their faces.

We therefore disagree with the PCRA court that Dr. Wetli's testimony would have been helpful to the defense. As this claim lacks arguable merit, trial counsel was not ineffective for failing to call Dr. Wetli or an expert that shared his opinions to testify at trial.

Tressel, on the other hand, testified that in addition to the absence of injuries to the bodies, lack of damage to their clothing and the locations in which they were found, the blood flow evidence was also wholly incompatible with White's testimony that the victims were shot and thrown from a moving van. Like Dr. Wetli, Tressel acknowledged that the manner the victims' were removed from the van, the force used to remove them, the height of the van and the speed it was traveling could have had an effect on the injuries the victims received (and, presumably, the amount of damage caused to their clothing). N.T., 3/11/2013, at 84-85, 123. According to Tressel, however, none of these factors would have altered the blood flow patterns on the victims, which, in his expert opinion, led only to a conclusion that the victims were shot in the locations where the police found the bodies. Id. at 123.

Tressel also testified that Kevin Anderson, the smallest of the three victims, did not have any gunshot wounds to his face, which contradicted White's statement to police. Id. at 47. He further testified that none of the victims sustained gunshot wounds consistent with White's statement that the victim was looking at the shooter's gun when they were shot. Id. at 48.

Based upon the PCRA court's credibility determinations, and viewing the record in the light most favorable to Williams, we conclude that Tressel's blood flow and gunshot wound testimony would have been helpful and beneficial to Williams' defense.[21] His testimony would have established that the forensic and medical evidence refuted White's version of the murders. We therefore agree with the PCRA court that, with respect to Tressel's blood flow and gunshot wound testimony, this issue has arguable merit.

### 2. Reasonable Basis

When assessing whether counsel had a reasonable basis for his act or omission, the question is not whether there were other courses of action that counsel could have taken, but whether counsel's decision had any basis reasonably designed to effectuate his client's interest. Commonwealth v. Eichinger, 108 A.3d 821, 848 (Pa. 2014) (citing Commonwealth v. Williams, 899 A.2d 1060, 1063-64 (Pa. 2006)). As the Commonwealth accurately states, this cannot be a hindsight evaluation of counsel's performance, but requires an examination of "whether counsel made an informed

---

[21] We disagree with the Commonwealth's categorization of his testimony as "a double-edged sword." As Tressel testified at the PCRA hearing, the medical examiners recovered a bullet fragment from Kevin Anderson's brain, which was determined to have been fired from either a .380 or .9 millimeter gun, and two bullets from Reynolds that were determined to have been fired from either a .38 or .357 gun. N.T., 3/11/2013, at 106; N.T., 7/27/2013, at 189-90, 191. Although White testified that at the time of the robbery, Bennett had a .357 and Williams had the .9 millimeter "he always carried," White did not testify that Bennett shot anyone; according to White's testimony, Williams was the only one to shoot the victims. See N.T., 7/26/1993, at 62 (White testifying that Bennett told him that Williams murdered the first victim by shooting him in the head), 64-65 (White testifying that he observed Williams shoot the second victim in the van), 66 (White testifying that he saw Williams put a gun to the third victim and then heard two gunshots). Further, the only bullet recovered that could have been shot from a .9 millimeter gun was not fired from the .9 millimeter gun recovered from Williams when he was arrested. N.T., 7/27/1993, at 193.

choice, which at the time the decision was made reasonably could have been considered to advance and protect [the] defendant's interests." Commonwealth v. Dunbar, 470 A.2d 74, 77 (Pa. 1983). Our evaluation of counsel's performance is "highly deferential." Commonwealth v. Tharp, 101 A.3d 736, 772 (Pa. 2014) (quoting Strickland v. Washington, 466 U.S. 668, 689 (1984)).

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

Strickland, 466 U.S. at 690-91; *see also* Commonwealth v. Johnson, 966 A.2d 523, 535-36 (Pa. 2009) ("The duty to investigate, of course, may include a duty to interview certain potential witnesses; and a prejudicial failure to fulfill this duty, unless pursuant to a reasonable strategic decision, may lead to a finding of ineffective assistance.").

Trial counsel's testimony at the PCRA hearing reveals that his decision not to call an expert witness to testify on Williams' behalf was not a "strategic choice." As the PCRA court observed, trial counsel testified at the PCRA hearing that when he was preparing to represent Williams at trial, he did not consult with or "even give … a

thought" to hiring a medical or forensic expert to testify for the defense.[22]   N.T., 3/12/2013, at 66-67.

This Court has held, however, that the failure to call an expert witness does not necessarily render counsel's performance deficient.

> Trial counsel need not introduce expert testimony on his client's behalf if he is able effectively to cross-examine prosecution witnesses and elicit helpful testimony. Additionally, trial counsel will not be deemed ineffective for failing to call a medical, forensic, or scientific expert merely to critically evaluate expert testimony that was presented by the prosecution. Thus, the question becomes whether or not defense counsel effectively cross-examined the Commonwealth's expert witness.

Chmiel, 30 A.3d at 1143 (quoting Commonwealth v. Marinelli, 810 A.2d 1257, 1269 (Pa. 2002)) (brackets omitted).

The trial record confirms the PCRA court's finding that counsel conducted no cross-examination of the Commonwealth's experts, failing to ask a single question of any of the three testifying representatives of the Medical Examiner's Office. Questioning of the Commonwealth's doctors by counsel for Williams' codefendants only

---

[22]  At the PCRA hearing, trial counsel testified, in hindsight, that he believed a separate defense expert was unnecessary because he could have obtained all of the necessary testimony in support of the defense theory from the witnesses from the Medical Examiner's Office.   N.T., 3/12/2013, at 67.   As stated, however, this testimony is irrelevant to our consideration of the reasonableness of counsel's time-of-trial decision making.

We recognize that there are two possible interpretations to trial counsel's testimony that he never gave a thought to retaining an expert.   One is that he deemed it so unnecessary he never gave it a thought, whereas the other is that the idea of retaining an expert never occurred to him.   Trial counsel did not further explain the meaning. Because the PCRA record must be viewed in the light most favorable to Williams, we find no error in the PCRA court's assignment of the latter interpretation to trial counsel's statement.

touched upon the fact that there were no non-gunshot-related injuries on the victims' bodies, and the answers given to these questions did not preclude a conclusion that White testified truthfully. *See generally* N.T., 7/28/1993, at 141-167; N.T., 7/29/1993, at 4-25.

As previously stated herein, the trial court prohibited counsel for both Wilson and Bennett from questioning the Commonwealth's experts about whether the absence of non-gunshot injuries to the victims was inconsistent with White's testimony that the victims were "pushed" or "thrown" from a moving van, as there were "too many variables." N.T., 7/28/1993, at 161-67. Although the Commonwealth is correct that trial counsel cannot be faulted for failing to ask questions related to the hypothetical question that the trial court disallowed, Commonwealth's Brief at 56, the record reflects that trial counsel had already opted to forgo questioning of the experts prior to the hypothetical question being presented by the other defendants' counsel. N.T., 7/28/1993, at 156, 161-67.

Neither trial counsel nor counsel for Williams' codefendants questioned the Commonwealth's experts about whether any of the victims sustained a gunshot wound consistent with White's testimony and statement to police, including Kevin Anderson, the "smallest" victim, who had no gunshot wounds anywhere on his face.[23] As stated

---

[23] The Commonwealth's waiver argument regarding Williams' reference to the "smallest" victim is waived, as the Commonwealth raised it for the first time on appeal, and did not object to the line of questioning at the PCRA hearing or Williams' reference thereto in his post-hearing brief. Commonwealth v. Weiss, 81 A.3d 767, 803 n.19 (Pa. 2013); Pa.R.A.P. 302(a). Furthermore, the Commonwealth's argument that trial counsel's cross-examination of White showed that White was a "poor judge of size," rendering reasonable trial counsel's decision not to use White's November 4, 1991 statement for impeachment, is groundless. The Commonwealth is attempting to create (continued…)

above, two of the victims (Reynolds and Gavin Anderson) were shot somewhere on their faces, but this does not render Williams' claim "frivolous" as the Commonwealth contends. *See* Brief for the Commonwealth at 53. Dr. Gulino and Tressel agreed that Gavin Anderson could not have been one of the victims shot inside the van. *See* N.T., 3/11/2013, at 21; N.T., 3/13/2013, at 158, 175. Further, although only briefly touched upon at the PCRA hearing, Tressel testified that none of the victims' gunshot wounds were consistent with having been shot while looking at Williams and Williams' gun. N.T., 3/11/2013, at 47-48; *see* Trial Exhibit D-10. The Commonwealth presented no testimony in this area and asked no questions to refute this conclusion.

No defense attorney cross-examined the Commonwealth's witnesses about the blood flow patterns exhibited on the victims and their clothing. The jury was never informed of the science behind the blood patterns, let alone that an expert would conclude that this evidence was inconsistent with White's testimony.

Because the jury was not exposed to this evidence, which would have directly contradicted White's trial testimony, the record and the law support the PCRA court's conclusion that trial counsel had no reasonable strategic basis for failing to cross-examine the Commonwealth's experts in these areas or call an expert witness to provide this testimony.

---

(…continued)
a reasonable basis for trial counsel's actions that trial counsel never endorsed. To the contrary, when asked at the PCRA hearing, trial counsel testified that he had no recollection of White telling police that the smallest victim was shot in the face while looking at Williams and Williams' gun, and could not say that he had any strategic reason for not questioning White about it. N.T., 3/12/2013, at 71.

### 3. **Prejudice**

Turning to the prejudice determination, the question is whether "there is a reasonable probability that, but for trial counsel's errors, the result of the proceeding would have been different." Commonwealth v. Bomar, 104 A.3d 1179, 1202 (Pa. 2014) (citing Commonwealth v. Koehler, 36 A.3d 121, 150 (Pa. 2012)), *cert. denied*, 136 S. Ct. 49 (U.S. 2015). It is undisputed that White was the Commonwealth's key witness and central to its prosecution of Williams. He was (allegedly) an eyewitness to the murders and provided a comprehensive description to the jury of the gruesome events that purportedly preceded the deaths of these young men. No other witnesses directly implicated Williams as the perpetrator of these murders.[24]

It is also undisputed that White's credibility was dubious at best. He gave numerous, conflicting, statements to the police about various crimes that he purportedly witnessed, including one highly detailed statement wherein he falsely implicated

---

[24] The record reflects that there was some evidence presented that, at most, circumstantially or tangentially either linked Williams to the murders or corroborated certain aspects of White's testimony. For example, Craig Vaughn, a jailhouse lawyer, testified that White confided in him that he perpetrated these murders along with "Chris" from Germantown. N.T., 7/29/1993, at 173-76. Marian Anderson, the sister of the Anderson brothers, testified that she saw Williams in New York with her brothers and Reynolds two weeks prior to their murders, and that upon making eye contact with her in the courtroom, Williams "put his head down." N.T., 7/27/1993, at 11-14. David Lee testified that he purchased guns for Williams, one of which was the .9 millimeter gun that police found when they arrested Williams, consistent with White's testimony that Williams always carried a .9 millimeter gun. N.T., 7/26/1993, at 53; N.T., 7/27/1993, at 64; N.T., 7/28/1993, at 6. Notably, the Commonwealth's ballistics expert testified that this gun did not fire the .380/.9 millimeter bullet specimen recovered from Kevin Anderson. N.T., 7/27/1993, at 193. None of the evidence conclusively ties Williams to these murders, nor does it in any way corroborate White's testimony regarding the manner in which the homicides allegedly occurred. It therefore does not factor into our prejudice analysis because, as even the Commonwealth admitted below, "[u]nless the jury believed White, … the prosecution's case against [Williams] would fail." Commonwealth's Motion to Dismiss, 6/5/2001, at 20.

Williams as the perpetrator of another murder. *See* N.T., 7/26/1993, at 45, 147-51. He admitted multiple times during his testimony that he had previously lied to police. *See* id. at 99, 117-18, 132, 137-45, 147-57, 159-63, 173-79, 182-83, 185, 256, 289, 298-99. At the time of trial, White was a six-time convicted first-degree murderer, serving six concurrent life sentences pursuant to a plea agreement with the Commonwealth, and he admitted that he was involved in the commission of other crimes as well. Id. at 7, 22-23, 84-85, 188-89, 209-10, 213-14, 267. Further, White did not initially tell the police about the murders in question, and only did so after a fellow inmate (in whom White had apparently confided) told the police that White disclosed his involvement in these murders. Id. at 259-61.

During cross-examination, the three defense counsel impeached White's credibility regarding various other matters about which he testified. Our review of the record reveals, however, that cross-examination of White left his story about the three murders at issue largely unscathed. Furthermore, as our discussion of the second prong reveals, cross-examination of the Commonwealth's medical experts likewise did little to advance the theory that the murders could not have happened as testified by White. The only information of which the jury was made aware that even arguably called White's version of events into question was that the victims had no non-gunshot-related injuries on their bodies, but the Commonwealth's experts testified that this did not render White's testimony inconsistent with the physical, medical or forensic evidence.

The expert testimony presented at the PCRA hearing, found credible by the PCRA court, was that White's account of two of the victims being shot inside a van and

thrown therefrom onto the sidewalk was incompatible with the medical and forensic evidence presented. Rather, Tressel testified (and Dr. Guilino, in part, agreed) that the forensic evidence revealed that the victims were shot in the locations where they were found.[25] This testimony, if believed by the jury, coupled with the other evidence impeaching White's credibility, would likely have changed the jury's mind and resulted in Williams' acquittal of the three murders. *Cf.* Commonwealth v. Legg, 711 A.2d 430, 435 (Pa. 1998) (finding prejudice based upon trial counsel's failure to present testimony in support of a diminished capacity defense at the defendant's trial for first-degree murder because the evidence of the defendant's specific intent to kill "was not so overwhelming" to result in a conclusion that the defendant was not prejudiced, and thus the grant of a new trial was appropriate to permit the trial court to weigh the

---

[25] Contrary to the position taken by Chief Justice Saylor in his concurring opinion, the blood spatter and blood flow evidence would not only have served to impeach White's testimony, but constituted substantive evidence that provided an alternate scenario for the commission of the crime (i.e., the victims were shot where they were found and were not thrown from a van). Further, the Chief Justice's reliance upon trial testimony that it rained at some unknown time for an unknown duration after the murders -- an area the Commonwealth neither raised nor pursued either in its questioning or its arguments before the PCRA court -- does not invalidate Tressel's testimony. The notion that the blood evidence on the bodies was washed away prior to their discovery, rendering the blood flow evidence obsolete, is belied by the testimony and photographic evidence presented at the PCRA hearing. Reynolds, for example, was found lying on his back, and nonetheless had blood running down his face, coming from his nose. N.T., 3/11/2013, at 51. According to Tressel, the blood began to run in one direction when Reynolds was shot, while standing, and then traveled across his lip in another direction after he fell to the ground, all of which was visible in the crime scene photograph. Id. at 81; *see* PCRA Exhibit P-13. Further, Kevin Anderson was found lying on his stomach, face down. Id. at 39. The front of his body therefore would have been shielded from the elements. Tressel's conclusion that Kevin Anderson was shot where he was found and could not have been thrown from a van was based, in part, on the blood pattern and pooling observable on the front of his shirt. Id. at 39-40.

unpresented evidence).  We therefore agree with the PCRA court that Williams suffered prejudice.

Based upon the standard by which we review decisions of the PCRA court and the credibility determinations it made, we find no error in the PCRA court's conclusion that trial counsel was ineffective for failing to present expert testimony or cross-examine the Commonwealth's experts on these discrepancies.

### C. Ineffective Assistance of Appellate Counsel

The Commonwealth also challenges the PCRA court's determination that appellate counsel was ineffective for failing to present on direct appeal the above claim of trial counsel's ineffectiveness as well as a claim of trial court error for limiting cross-examination of the Commonwealth's experts regarding the absence of non-gunshot injuries on the victims' bodies.

### 1. Waiver

The Commonwealth first argues that these claims are unreviewable as Williams did not properly layer his claims of ineffective assistance of appellate counsel. Specifically, Williams failed to plead and prove that Attorney Seay, who filed a post-sentence motion on Williams' behalf, was ineffective for not raising the claims of trial court error and trial counsel's ineffectiveness at issue here.  Brief for the Commonwealth at 34-37.  As the Commonwealth raises this contention for the first time on appeal, the PCRA court did not address this argument in its written opinion.[26]

---

[26]  Williams incorrectly asserts that the Commonwealth's failure to raise this argument below results in a finding of waiver.  Williams' Brief at 41-42.  The question of whether Williams properly layered his ineffectiveness claims is a question of issue preservation and implicates a court's ability to review the claim.  Commonwealth v. Hubbard, 372 (continued…)

The law at the time of Williams' conviction required post-verdict motions to include every claim of error the defendant wished to raise on appeal; any omitted claims were waived. *See* Commonwealth v. Green, 709 A.2d 382, 383 n.4 (Pa. 1998) (stating that post-verdict motions were required to preserve issues for appellate review for all defendants convicted prior to January 1, 1994). In Commonwealth v. Hubbard, 372 A.2d 687 (Pa. 1977), *overruled by* Commonwealth v. Grant, 813 A.2d 726 (Pa. 2002), this Court stated that because the law required claims of ineffectiveness of prior counsel to "be raised as an issue at the earliest stage in the proceedings at which the counsel whose effectiveness is being challenged no longer represents the defendant[,] … [i]t follows that when newly appointed post-trial counsel fails to assign the ineffectiveness of trial counsel as a ground for post-trial relief, the issue of trial counsel's ineffectiveness is not properly preserved for appellate review." Id. at 695 n.6; *see* supra, n.9. The Hubbard Court thus found that direct appeal counsel's claims of trial counsel's ineffectiveness were not preserved for appellate review based upon post-sentence counsel's failure to raise the claims in a post-sentence motion.[27] Hubbard, 372 A.2d at 695.

A year after our decision in Hubbard, we decided Commonwealth v. McKenna, 383 A.2d 174 (Pa. 1978). Despite recognizing the importance of the doctrine of waiver

(…continued)
A.2d 687, 695 (Pa. 1977), *overruled by* Commonwealth v. Grant, 813 A.2d 726 (Pa. 2002).

[27] In Hubbard, direct appeal counsel also raised on appeal that post-sentence motion counsel was ineffective for failing to raise the waived claims of trial counsel's ineffectiveness. The Court reviewed those claims, determined that one had arguable merit worthy of an evidentiary hearing, and remanded the case to the trial court. Hubbard, 383 A.2d at 695-700.

to the judicial process, the Court held that there were "occasional rare situations where an appellate court must consider the interests of society as a whole in seeing to it that justice is done," requiring that we overlook waiver in capital cases. Id. at 180; *see also* id. at 181 ("The waiver rule cannot be exalted to a position so lofty as to require this Court to blind itself to the real issue[,] the propriety of allowing the state to conduct an illegal execution of a citizen."). This was subsequently termed the "relaxed waiver" doctrine, which this Court, in its discretion, utilized for more than twenty years to permit review of claims in capital cases that would otherwise have been waived for lack of preservation. *See, e.g.,* Commonwealth v. Zettlemoyer, 454 A.2d 937, 955 n.19 (Pa. 1982) (addressing a claim on appeal not raised in post-verdict motions, which therefore would have been waived, based upon this Court's "independent, statutory obligation to determine whether a sentence of death was the product of passion, prejudice or some other arbitrary factor, whether the sentence is excessive or disproportionate to that imposed in similar cases, and to review the record for sufficiency of the evidence to support aggravating circumstances"), *abrogated by* Commonwealth v. Freeman, 827 A.2d 385 (Pa. 2003);[28] *but see, e.g.,* Commonwealth v. Peterkin, 513 A.2d 373, 378 (Pa. 1986) (finding waiver, in a capital case, of the defendant's claim that the trial court

---

[28] In Freeman, this Court abrogated the relaxed waiver doctrine prospectively in capital direct appeals. Freeman, 827 A.2d at 402 (holding that, going forward, "as a general rule on capital direct appeals, claims that were not properly raised and preserved in the trial court are waived and unreviewable"). The Court left the McKenna decision intact, stating, however, that it would be the "'rare' claim" that would necessitate this Court's review of a waived issue of the constitutional dimension that was "fundamental and plainly meritorious[.]" Id. Nonetheless, at the time this Court decided Williams' direct appeal in 1998, the relaxed waiver doctrine remained in full force and effect. *See* Williams I, 720 A.2d at 684 n.12.

improperly excluded two prospective jurors based upon their views of capital punishment as trial counsel failed to object to the exclusion of these jurors).

Therefore, at the time of Williams' direct appeal in this matter, the Williams I Court may have reviewed the claims at issue, despite their waiver by Attorney Seay. As we explained in Williams II, it can be difficult to determine whether this Court would have exercised its discretion to invoke the relaxed waiver doctrine to decide what would otherwise have been a waived issue. Williams II, 936 A.2d at 25. Our review of the decision by the Williams I Court reveals that the Court invoked the relaxed waiver doctrine to address "several claims" that Williams did not preserve before the trial court. Williams I, 720 A.2d at 684 n.12. In fact, this Court reviewed all of the claims Williams raised on direct appeal, regardless of whether they were preserved in the court below, including various claims of trial counsel's ineffectiveness that Attorney Seay failed to raise in his post-sentence motion, and relied upon Zettlemoyer in support of its use of the relaxed waiver doctrine. *See* id. at 684 n.12, 685-87.[29]

---

[29] Although the certified record does not contain Attorney Seay's post-sentence motion, the trial court in its written opinion on direct appeal detailed the issues raised therein. Regarding claims of trial counsel's ineffectiveness, the trial court described the motion as containing a bald allegation of trial counsel's ineffectiveness without elaboration, accompanied by "a list of complaints of trial counsel ineffectiveness handwritten by [Williams]," each of which the trial court proceeded to list and explain the basis for its denial. Trial Court Opinion, 4/24/1996, at 3-5. The ineffectiveness claims included trial counsel's failure to visit Williams more than twice prior to trial; seek suppression of certain statements made by witnesses for the Commonwealth because of inconsistencies appearing therein; seek the trial judge's recusal based upon the judge's pretrial disclosure that the prosecutor was a witness to an automobile accident in which the judge was involved; object to the trial court's more favorable treatment of the prosecution; request a mistrial based upon the trial court's limitation of cross-examination of the representatives of the Medical Examiner's Office; and trial counsel's advice that Williams not testify. Id. at 4-5.

(continued…)

On this record, we are nearly certain that if appellate counsel had raised a claim on direct appeal alleging trial counsel's ineffectiveness for failing to present expert testimony or adequately cross-examine the Commonwealth's experts and a claim of trial court error in limiting defense counsels' cross-examination of the Commonwealth's experts, this Court would have reviewed the issues despite Attorney Seay's failure to raise them in his post-sentence motion. Because direct appeal counsel could have raised these claims before this Court on direct appeal, and this Court, in all likelihood, would have reviewed the issues, direct appeal counsel can still be found to have rendered ineffective assistance despite Williams' failure to properly layer an allegation of post-sentence counsel's ineffectiveness in his PCRA petition. As such, the Commonwealth's argument fails.

## 2. **Reasonable Basis for Omission of Ineffectiveness Claim**

The Commonwealth further asserts that Williams did not "substantiate his allegation" of appellate counsel's ineffectiveness in failing to raise on direct appeal the above-discussed claim of trial counsel's ineffectiveness. Brief for the Commonwealth at 37. The Commonwealth states that Williams alleged in his PCRA petition that appellate

---

(…continued)

Our review of the Williams I decision reveals that this Court addressed multiple claims of trial counsel's ineffectiveness raised for the first time on appeal, including trial counsel's failure to object to testimony by a detective that the police believed Williams and his codefendants were involved in as many as two dozen homicides; his failure to object to testimony given by the sister of the Anderson brothers that she recognized Williams, having seen him with her brothers approximately two weeks before their deaths and that upon seeing her in the courtroom, he put his head down on the table; his failure to object to hearsay statements made by a witness at trial; and his failure to request a curative instruction after the trial court denied trial counsel's request for a mistrial when a testifying witness compared Williams to "Aaron Jones," who, according to Williams, was "one of the most notorious killers in Philadelphia history." Williams I, 720 A.2d at 685-87.

counsel was operating under the mistaken belief that he could only raise record-based claims on direct appeal, but at the PCRA hearing, appellate counsel testified that he was well aware that he was required to raise all claims of ineffective assistance of counsel on direct appeal, including extra-record issues. Id. at 37-38 (citing N.T., 3/12/2013, at 100). According to the Commonwealth, appellate counsel's strategy of winnowing down the issues and eliminating weaker claims was eminently reasonable, as both this Court and the United States Supreme Court have found that the exclusion of arguably meritorious claims to advance arguments on appeal that counsel believes to have a better chance of success is "sound appellate practice[.]" Id. at 39-43 (citing, inter alia, Smith v. Robbins, 528 U.S. 259, 288 (2000); Commonwealth v. Bracey, 795 A.2d 935, 950 (Pa. 2001)).

The PCRA court, on the other hand, found that appellate counsel admitted that he confined his claims to those appearing of record and that this was consistent with his practice at the time. PCRA Court Opinion, 12/30/2013, at 40-41 (citing N.T., 3/12/2013, at 98-99). The PCRA court found that this was improper because, as discussed at length hereinabove, the law required all claims of ineffective assistance of prior counsel to be raised at the earliest stage following the appointment or retention of new counsel. Id. at 41. The PCRA court further observes, as we did above, that appellate counsel was not constrained by the omission of this issue from Williams' post-sentence motions, as the relaxed waiver doctrine would have permitted this Court to review these issues despite their waiver, and appellate counsel raised numerous other claims that Attorney Seay failed to preserve for our review on direct appeal. Id. The PCRA court concluded that appellate counsel's decision not to raise this meritorious claim was unreasonable

and prejudiced Williams, as this issue would likely have been successful on appeal. Id. at 41-42.

Williams asserts that there is no support in the record for a finding that appellate counsel relied upon any strategic reason for failing to raise on direct appeal this claim of ineffective assistance of trial counsel. Brief for Williams at 44-45. Rather, according to Williams, appellate counsel's testimony was that he simply failed to investigate non-record claims, which was ineffective. Id. at 45.

An assessment of appellate counsel's ineffectiveness for failing to raise a claim of trial counsel's ineffectiveness involves the same type of proof required for any claim of ineffective assistance of counsel. The petitioner has the burden of pleading and proving that the underlying claim has arguable merit (i.e., that trial counsel in fact rendered ineffective assistance in the manner that should have been alleged on appeal); appellate counsel did not have a reasonable strategic basis for failing to raise the claim; and the petitioner was prejudiced, as there is a reasonable probability that the outcome of the direct appeal would have been different if appellate counsel had raised the omitted claim. Commonwealth v. Blakeney, 108 A.3d 739, 750 (Pa. 2014), *cert. denied*, 135 S. Ct. 2817 (U.S. 2015); Commonwealth v. Lopez, 854 A.2d 465, 469 & n.5 (Pa. 2004).

As our discussion under Section B makes clear, the underlying claim has arguable merit. The Commonwealth otherwise only challenges the PCRA court's finding that appellate counsel's failure to raise the claim was not based upon a

reasonable appellate strategy.[30]  Our review of the notes of testimony from the PCRA hearing reveals that appellate counsel testified that he had little to no independent recollection of his representation of Williams.  N.T., 3/12/2013, at 100, 102.  He testified that although he was aware of his obligation to raise claims of ineffective assistance of prior counsel "as soon as possible," he acknowledged that he raised only record-based claims in support of Williams' direct appeal and that he had no recollection of undertaking an investigation of any potential extra-record issues, including failing to seek funds for the appointment of an expert.[31]  Id. at 99-100, 104-05.  He testified that this was "not inconsistent" with his practice at that time.  Id. at 99.

It is true that "arguably meritorious claims may be omitted in favor of pursuing claims which, in the exercise of appellate counsel's objectively reasonable professional judgment, offer a greater prospect of securing relief."  Bracey, 795 A.2d at 950 (citing Jones v. Barnes, 463 U.S. 745, 750-54 (1983)).  "Appellate counsel need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." Id. at 950-51 (quoting Robbins, 528 U.S. at 288).  Contrary to the Commonwealth's argument, however, appellate

---

[30]  We confine our discussion to the points raised, and therefore do not engage in a lengthy discussion of the PCRA court's finding that Williams was prejudiced by appellate counsel's failure to raise this claim of trial counsel's ineffectiveness.

[31]  The PCRA court found that "[a]ppellate counsel lacked a proper understanding of the law and his obligation to investigate and raise all claims of prior counsel's ineffectiveness at the first available opportunity."  PCRA Court Opinion, 12/30/2013, at 40-41.  While we disagree that the record supports a finding that appellate counsel was **unaware** that he had to raise both record- and non-record-based claims at the earliest opportunity, the record clearly supports a finding that, despite this knowledge, appellate counsel failed to do so in Williams' direct appeal without a reasonable strategic basis for that decision.

counsel did not testify that he made a reasoned decision to exclude this particular claim of trial counsel's ineffectiveness in an effort to winnow down his arguments to those that had the highest chance for success on appeal. Although appellate counsel testified that he had no independent recollection regarding the issues he raised on appeal or why he chose the issues he raised, he recalled that he did not seek funds to consult with an expert while representing Williams and he acknowledged that raising only record-based claims was consistent with his practice at the time of Williams' direct appeal.

Moreover, to say appellate counsel omitted this claim of trial counsel's ineffectiveness in pursuit of fewer, more meritorious issues strains credulity. Appellate counsel raised eighteen claims on direct appeal, several of which the Williams I Court deemed "specious." *See* Williams I, 720 A.2d at 685 n.13, 686, 689, 690, 691.

Reviewing the PCRA record in the light most favorable to Williams, we conclude that it supports the PCRA court's factual findings and legal conclusion that appellate counsel had no reasonable basis for failing to raise the claim of trial counsel's ineffectiveness for not calling an expert to testify or cross-examining the Commonwealth's experts regarding the blood flow evidence and gunshot wound evidence. We similarly find that the record and the law support the PCRA court's determination that Williams was prejudiced by appellate counsel's failing. As our discussion above suggests, there is a substantial likelihood that the outcome of Williams' direct appeal would have been different had appellate counsel raised this issue at that time.

## IV. Conclusion

The PCRA court's determination that appellate counsel rendered ineffective assistance by not raising a claim of trial counsel's ineffectiveness for failing to call an expert or question the Commonwealth's experts regarding the inconsistencies between White's testimony and the locations the victims were found and the absence of non-gunshot injuries and clothing damage on the victims is without merit. As such, the PCRA court erred by granting Williams a new trial on that basis. Its conclusion that appellate counsel was ineffective in not raising a claim of trial counsel's ineffectiveness for failing to call an expert to testify or question the Commonwealth's experts regarding the blood flow and gunshot wound evidence is supported by both the record and the law. We therefore find no error in its decision to grant Williams a new trial on this basis. Because we affirm the PCRA court's decision to grant Williams a new trial, it is unnecessary for us to address the propriety of the PCRA court's determination that appellate counsel was also ineffective for failing to raise on direct appeal a claim of trial court error in limiting defense counsels' cross-examination of the Commonwealth's experts, which the court below likewise concluded entitled him to a new trial.[32] Further, our decision here renders moot the issues raised in Williams' cross-appeal.

---

[32] We take no position on Chief Justice Saylor's conclusion in his concurrence that the trial court's actions constituted a structural error that necessitates the grant of a new trial. While the trial court erred in limiting cross-examination of an expert witness through the use of hypothetical questions and denigrating defense counsel's attempt to pursue the line of cross-examination, defense counsel was able to elicit testimony in support of the defense theory from two of the Commonwealth's experts and presented closing argument on the facts that counsel attempted to develop with the precluded cross-examination. Because the record fully supports the PCRA court's determination that appellate counsel was otherwise ineffective for failing to raise a claim of ineffective assistance of counsel based upon trial counsel's failure to present the above-discussed
(continued…)

Order affirmed.

Justices Baer and Todd join the opinion, and Justice Wecht joins the opinion except in the treatment of the claim premised upon the post-conviction testimony of Charles Wetli, MD.

Chief Justice Saylor files a concurring opinion in which Justice Dougherty joins.

Justice Wecht files a concurring opinion.

---

(…continued)
expert testimony, it is unnecessary in this case to engage in the detailed analysis necessary to determine whether the law of structural error applies to the record before us, especially in light of the fact that the parties neither raised nor briefed this question on appeal. *See* Neder v. United States, 527 U.S. 1, 8 (1999) (stating that a finding of structural error, which requires automatic reversal, is reserved for "a very limited class of cases") (citations and quotation marks omitted).