J-S41010-25
J-S41011-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | : | |
| v. | : | |
| BRYAN BROWN-CAMP | : | No. 977 EDA 2025 |

Appeal from the PCRA Order Entered April 1, 2025
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0003503-2015

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | : | |
| v. | : | |
| MAURICE SMITH | : | No. 976 EDA 2025 |

Appeal from the PCRA Order Entered April 1, 2025
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0003502-2015

BEFORE: BOWES, J., BECK, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY BOWES, J.: **FILED MARCH 2, 2026**

The Commonwealth appeals from the orders granting the petitions filed by co-defendants Bryan Brown-Camp and Maurice Smith, pursuant to the Post Conviction Relief Act ("PCRA"). For the reasons discussed *infra*, we reverse the orders granting relief.

_____

[*] Retired Senior Judge assigned to the Superior Court.

This homicide has a long history in this Court.[1] In 2017, Smith and Brown-Camp were convicted by a jury of third-degree murder and conspiracy to commit robbery for their involvement in the shooting death of Tevan Patrick. According to the Commonwealth, on April 22, 2013, the co-defendants had "lured the victim into their car to ostensibly commit a robbery, but [ended up] kill[ing] him." *Commonwealth v. Brown-Camp* ("*Brown-Camp I*"), 209 A.3d 525, 2019 WL 310813, at *1 (Pa.Super. 2019) (unpublished memorandum).

Since their jury trial, we have had multiple occasions to address the propriety of their convictions. In doing so, we supplied the following background and outline of the evidence produced at trial:

> On April 25, 2013, the body of [Mr.] Patrick . . . was found inside an abandoned property in Philadelphia. [Mr. Patrick] had been shot nine times at close range. After an investigation, the Commonwealth charged [Smith and Brown-Camp], with murder, conspiracy to commit murder, robbery, conspiracy to commit robbery, possession of a firearm prohibited, firearms not to be carried without a license, carrying a firearm in Philadelphia, and possession of an instrument of crime. A jury trial occurred from February 22, 2017 to March 2, 2017.
>
>       . . . .

---

[1] Indeed, this author alone has already drafted three non-precedential decisions in prior appeals from orders disposing of the same PCRA petitions at issue in the matters *sub judice*. *See Commonwealth v. Brown-Camp*, 336 A.3d 973, 2025 WL 817162 (Pa.Super. 2025) (non-precedential decision); *Commonwealth v. Brown-Camp*, 287 A.3d 901, 2022 WL 16545564 (Pa.Super. 2022) (non-precedential decision); *Commonwealth v. Smith*, 287 A.3d 849, 2022 WL 6906967 (Pa.Super. 2022) (non-precedential decision).

- 2 -

The circumstantial evidence presented in this case weaves together a tale of the actions of [Smith] and Brown-Camp throughout the day on April 22, 2013. The day began with [Mr. Patrick] sending a text message to Janeicia Jackson, Brown-Camp's girlfriend, requesting Brown-Camp's new cell phone number. Sometime after Jackson provided the number, Brown-Camp called [Smith] and asked [Smith] to pick him up. [Smith] and his girlfriend, Jackie Brown, picked up Brown-Camp in her four[-]door silver Hyundai. [Smith] and Brown-Camp dropped Brown off at work, at approximately 3:00 p.m., and borrowed her car. Reginald Tyler, [Mr. Patrick's] childhood friend, saw [Mr. Patrick] get into a silver[,] four[-]door car at the Citgo Station in Delaware. The phones of Brown-Camp and [Mr. Patrick] were both utilizing a cell phone tower near the Citgo Station at 7:26 p.m. and were in contact with one another at that time. The phones were geographically tracked to Southwest Philadelphia, along with [Smith's] cell phone. All three phones were utilizing cell towers that covered that site where [Mr. Patrick's] body was recovered. The property where [Mr. Patrick's] body was recovered was an abandoned property where [Smith's] cousin stayed sometimes. [Mr. Patrick's] cell phone went off-line at approximately 10:00 p.m., somewhere over the Schuylkill River, within a half-hour of being geographically located near Southwest Philadelphia with the phones of [Smith] and Brown-Camp. When the phone went offline, it was utilizing cell towers in the same area as [Smith's] phone, on the Schuylkill Expressway. Finally, [Smith] is seen by Jackson arriving in Brown's four[-]door silver car, a little after 10:00 p.m., at [Smith's] home, located at 3830 Parish Street (which is a short distance from the Schuylkill Expressway).

[Mr. Patrick] is last seen at the Citgo Station in Delaware on April 22, 2013. The last time he is heard from is close to 9:30 p.m. that evening when he states he is with Brown-Camp.

**Commonwealth v. Smith** ("**Smith I**"), 2019 WL 473575, at *1-2 (Pa.Super. 2019) (unpublished memorandum) (cleaned up).

Specifically, he sent two text messages shortly before his phone went offline, which referred to Brown-Camp by his known nickname of "B-Y." First, at 9:22 p.m., Mr. Patrick texted a female friend that "if some fishy shit happen

I was wit B-Y." *Id*. He also texted Reginald Tyler that "if anything fishy happened to me, B-Y did it." *Commonwealth v. Brown-Camp* ("*Brown-Camp II*"), 287 A.3d 901, 2022 WL 16545564, at *1 (Pa.Super. 2022) (non-precedential decision) (cleaned up). Importantly, "[a]round that time, the cell phones of [Mr. Patrick], [Smith], and Brown-Camp were all traced in the area of the abandoned house where [Mr. Patrick's] body was found." *Smith I*, 2019 WL 473575, at *2 (cleaned up).

Within the following week, Brown-Camp sought advice from his cousin, Melissa Palmer, about potential questions that homicide detectives might ask him because her ex-boyfriend had previously been investigated for and convicted of murder.[2] Brown-Camp explained that he had set up Mr. Patrick and was being blamed for his death based upon text messages Mr. Patrick sent. He admitted that he was present during the shooting, but was not the one who shot Mr. Patrick. *See* N.T. Jury Trial, 2/24/17 (morning), at 69.[3] Meanwhile, Smith told Terry Kearney and William Cummings "that he

_____

[2] At the subsequent trial, the Commonwealth frequently refreshed Ms. Palmer's recollection during her direct examination with her prior statement to police.

[3] The certified record contains two transcripts for February 24, 2017, both of which are labeled Volume I. For ease of reference, we named the volume containing the full testimony of Officer Raymond Andrejczak and Ms. Palmer and the direct examination of Terry Kearney as the morning volume, and the volume containing the remainder of Mr. Kearney's testimony as the afternoon. *See* N.T. Jury Trial, 2/24/17 (afternoon), at 5 (indicating that Mr. Kearney's cross-examination began at 3:16 p.m.).

committed the murder during the course of a robbery that he and Brown-Camp planned." ***Smith***, 2019 WL 473575, at *2 (cleaned up).

Eugene Baylor, an individual from the neighborhood who knew the co-defendants, testified at trial that in the spring of 2013, Smith asked him about serving in the Vietnam War and what it had felt like to kill someone. ***See*** N.T. Trial, 2/27/17, at 31. Later, Smith showed Mr. Baylor a .22 caliber shell and said "I did that." ***Id***. at 32-35. Mr. Baylor stopped Smith before he could say anything else. Although Mr. Baylor admitted to frequent drug use in 2013, which he used to purchase from the co-defendants, and having used heroin the morning he testified, he had provided the same statement to police in June of 2014. He further relayed that Brown-Camp was present for these conversations.

We summarized the pertinent forensic evidence like so:

> The Commonwealth's evidence established that Mr. Patrick was in full rigor mortis when he was found on April 25, 2013. Gary Collins, M.D., conducted Mr. Patrick's autopsy the following day, at which time Mr. Patrick remained in full rigor. Dr. Collins authored an accompanying report, but by the time of trial, no longer worked at the medical examiner's office in Philadelphia. Therefore, the Commonwealth called Albert Chu, M.D., to testify about the post-mortem findings. Smith's trial attorney elicited on cross-examination of Dr. Chu that rigor mortis typically starts within a few hours of death and usually persists for roughly forty-eight hours.

***Commonwealth v. Brown-Camp*** ("***Brown-Camp III***"), 336 A.3d 973, 2025 WL 817162, at *2 (Pa.Super. 2025) (non-precedential decision) (cleaned up). Thus, the standard window of rigor mortis indicated that Mr. Patrick's

death likely occurred sometime after April 22, in contravention of the Commonwealth's theory of guilt. Furthermore, during the autopsy, several bullets and bullet fragments were recovered from Mr. Patrick's body, four of which were confirmed as .22 caliber. *See* N.T. Jury Trial, 2/24/17 (morning), at 29. Finally, Dr. Chu explained that two of the nine gunshot wounds were fatal. The first, which penetrated Mr. Patrick's brain, "in most cases, . . . will cause immediate unconsciousness, if not death." N.T. Jury Trial, 2/23/17, at 96. The gunshot wound that struck his skull but did not enter the brain, "could have caused immediate incapacitation and/or death[.]" *Id*. at 98.

After hearing all this evidence, the jury adjudged Smith and Brown-Camp guilty of third-degree murder and conspiracy to commit robbery, and "not guilty of first-degree murder, conspiracy to commit murder, robbery, and all firearms charges. On August 2, 2017, [Smith] and Brown-Camp were both sentenced to an aggregate term of [twenty-two and one-half to forty-five] years of incarceration." *Smith I*, 2019 WL 473575, at *1 (footnote omitted). The co-defendants' post-trial proceedings did not follow identical paths. Therefore, we separate out much of the timeline between 2017 and today by each defendant and procedural stage. We begin with Brown-Camp's post-trial proceedings.

## I. Brown-Camp Direct Appeal & First PCRA Petition

Brown-Camp's direct appeal garnered him no relief in this Court or our Supreme Court. Notably, he challenged, among other things, the admissibility

of the text message Mr. Patrick sent to Mr. Tyler concerning B-Y being responsible if anything "fishy" happened to Mr. Patrick. Since Mr. Tyler no longer had the text message at the time of trial, the court permitted the Commonwealth to introduce its contents through testimony. On direct appeal, Brown-Camp argued that the testimony about the text message was inadmissible hearsay. However, we did not reach the merits of that issue because Brown-Camp's counsel had waived it by only objecting at trial based upon the best evidence rule.

Brown-Camp subsequently timely filed his first PCRA petition. Therein, he argued, *inter alia*, that trial counsel was ineffective for not objecting to the text message as hearsay and for failing to call Dr. Collins as an expert witness to rebut the Commonwealth's theory of when Mr. Patrick died. That petition resulted in the following disposition:

> The PCRA court dismissed the claim without a hearing for lack of merit. It offered no substantive analysis at the time it provided Brown-Camp notice of its intent to dismiss, nor did it proffer any explanation in the order of dismissal. In a later opinion to this Court, the PCRA court described that it had concluded that, although Brown-Camp established that a witness was willing and able to testify, and counsel should have been aware of the witness, he could not establish prejudice due to the overwhelming evidence that Mr. Patrick was murdered on April 22, 2013. **See** PCRA Court Opinion (Brown-Camp), 1/24/22, at 9-12.
>
> Upon review, we determined that the PCRA court erred because its conclusion was premised upon a credibility determination made without the benefit of an evidentiary hearing[.]
>
> . . . .

Consequently, we vacated the PCRA order dismissing that claim
and remanded for an evidentiary hearing on the prejudice prong
of the ineffective assistance of counsel test for the claim
challenging trial counsel's effectiveness in choosing not to call Dr.
Collins as an expert as to Mr. Patrick's time of death.

***Brown-Camp III***, 2025 WL 817162, at \*2-3. Similarly, we "vacate[d] the portion of the PCRA court's order denying relief for counsel's failure to object to the text message on hearsay grounds and remand[ed] for an evidentiary hearing on the reasonable basis and prejudice prongs." ***Brown-Camp II***, 2022 WL 16545564, at \*9. We now briefly set forth Smith's post-trial proceedings.

## II. Smith Direct Appeal & First PCRA Petition

Like Brown-Camp, Smith filed a direct appeal to this Court from his judgment of sentence. One of the issues he raised was whether the Commonwealth adduced sufficient evidence to sustain his convictions. In affirming, this Court set forth the body of evidence that had been introduced against Smith, which we recounted hereinabove. Smith timely filed his first PCRA petition after our Supreme Court denied his petition for allowance of appeal. The PCRA court appointed counsel, who submitted amended and supplemental petitions, challenging the effectiveness of trial counsel's representation. Of particular importance to the instant appeal, Smith added a claim, identical to that of Brown-Camp, that his trial counsel provided ineffective assistance for failing to call a forensic expert to rebut the Commonwealth's theory as to when Mr. Patrick was killed. Ultimately, like

with Brown-Camp, the PCRA court dismissed Smith's petition without a hearing.

Smith appealed that decision to this Court.  In his concise statement, he alleged for the first time "that trial counsel rendered ineffective assistance for failing to challenge Smith's conviction based upon a discrepancy between the date of the crime on the bills of information (April 25) and the Commonwealth's theory at trial of when the murder occurred (April 22)." ***Brown-Camp III***, 2025 WL 817162, at \*4.  We granted PCRA counsel's petition to remand the matter so that new counsel could be appointed to pursue the bills of information claim in the PCRA court and to re-raise any original PCRA claims.  ***See Commonwealth v. Smith*** ("***Smith II***"), 287 A.3d 849, 2022 WL 6906967 (Pa.Super. 2022) (non-precedential decision).

### III.   Post-Remand Joint Evidentiary Hearing & Granting of Relief

To recap, this Court vacated both orders denying PCRA relief as to the co-defendants.  We remanded for an evidentiary hearing in Brown-Camp's case, and the appointment of counsel in Smith's.  In compliance with our directive, the PCRA court appointed new counsel to represent Smith.  Although it rejected his claim regarding the bills of information, the court scheduled a joint evidentiary hearing on the co-defendants' claims that their respective trial attorneys were ineffective for failing to call Dr. Collins to refute the Commonwealth's trial theory that Mr. Patrick was shot and killed on April 22, 2013.

By way of further background, Dr. Collins had authored a supplemental report for Brown-Camp's PCRA petition, which provided as follows:

> [Dr. Collins] concluded that, based on the forensic evidence, it was highly unlikely that Mr. Patrick was shot and killed on April 22, 2013, and opined instead that his time of death was sometime between 5:00 p.m. on April 24 and 5:00 a.m. on April 25, 2013. Additionally, Dr. Collins opined that the two penetrating gunshot wounds to Mr. Patrick's head would have been immediately incapacitating and thus it was not possible that Mr. Patrick would have been shot on April 22, 2013, and survived his injuries until April 25, 2013.

**Brown-Camp III**, 2025 WL 817162, at *2 (cleaned up). He further clarified that the two gunshot wounds to Mr. Patrick's head would have caused death "at most within [five] to [ten] minutes[.]" Amended PCRA Petition (Brown-Camp), 12/28/20, at Exhibit K (Dr. Collins's Report, 12/15/20, at 5).

We summarized the evidence adduced at the April 5, 2023 PCRA hearing thusly:

> Of relevance, Brown-Camp and Smith introduced a chart cataloging the outside temperature in the area surrounding the abandoned house from April 22 to April 25, 2013, and called as witnesses the two pertinent medical examiners, Dr. Chu and Dr. Collins. Smith also presented testimony from his trial counsel, James Berardinelli, Esquire, regarding, *inter alia*, his investigation into calling an expert witness and cross-examining Dr. Chu about Mr. Patrick's time of death. The Commonwealth put forward Brown-Camp's trial attorney, Ch[r]istopher Phillips, Esquire.
>
> Dr. Chu explained that he was unaware of the Commonwealth's theory that Mr. Patrick died on April 22 when he testified at the jury trial. While he could not opine as to a specific time of death when asked at the PCRA hearing, he did provide a range. In doing so, he noted that the duration of the different stages of rigor mortis can be affected by the temperature where the body is kept. Dr. Chu acknowledged that he did not know the temperature inside the abandoned home where Mr. Patrick's body was found

or how that affected the duration of rigor mortis in this case. Nonetheless, he declared, based upon the status of Mr. Patrick's rigor mortis and the outdoor temperatures during the relevant period, that "it is possible he was killed on the 22nd but it is probably more likely he was killed closer to the 25th." He further clarified: "In my opinion, and, again, this is all sort of subjective based on observations of bodies, it is more likely that he was killed on the 23rd, or the 24th, or even earlier on the 25th, yes but I can't rule out that he was killed on the 22nd.

Dr. Collins testified that he conducted the autopsy of Mr. Patrick. His post-mortem findings included that Mr. Patrick remained in full rigor at the time of the exam, which, as noted, was conducted on April 26, 2013, one day after his body was found. Additionally, Dr. Collins discerned that his body showed no signs of decomposition, the internal organs were not dusky or discolored, and there had been no indication of rodent or insect activity. In consideration of these observations and the details reported from the crime scene, Dr. Collins determined the time of death to be "anywhere from most likely the 24th or the 25th . . . maybe as early as the 23rd but that's about it. Anything beyond that would be highly unlikely." N.T. PCRA Hearing, 4/5/23, at 110; *id*. at 137 (maintaining even after cross-examination that it was "highly unlikely" the shooting occurred on April 22). According to Dr. Collins, a theory of death occurring on April 22 was "outside of reason." *Id*. at 113.

Attorney Berardinelli did not remember his preparation of Smith's case or whether he investigated bringing in his own expert witness on this issue but conceded that he obviously did not present one. Despite being unaware whether he made a conscious decision to forego [*sic*] calling an expert witness on the issue, he admitted that attacking the Commonwealth's theory of the time of death was important for undermining the evidence regarding when Mr. Patrick last used his cell phone. Upon questioning by Brown-Camp's PCRA attorney about reaching out to Dr. Collins, he stated that he believed that he could, and did, get the answers he wanted on that issue from Dr. Chu during cross-examination. Attorney Berardinelli further expounded upon the general pros and cons of calling his own expert witness. Specifically, he noted that he generally preferred to challenge the Commonwealth's theory on cross-examination, instead of via his own expert witness, because cross-examination allows for an element of surprise that would be dispelled if the Commonwealth were instead put on notice of the

content of a defense expert's report. He concluded that the answers he elicited from Dr. Chu "gave [them] what [they] wanted in terms of when rigor occurred." ***Id***.

At the conclusion of the hearing, Brown-Camp's attorney provided extensive argument on the expert witness issue, while Smith's attorney focused primarily upon the alleged prosecutorial misconduct in failing to amend the bills of information, and otherwise rested on the amended petitions filed before and after remand as to the expert witness issue. ***Id***. at 230-244 (argument for Brown-Camp), 245-48 (argument for Smith).

***Brown-Camp III***, 2025 WL 817162, at *4–5 (cleaned up).

Following that hearing, the PCRA court "found that the co-defendants were prejudiced by their attorneys' failures to call Dr. Collins as an expert witness at trial" and therefore granted their PCRA respective petitions and ordered new trials. ***Id***. at *5. In light of this determination, the court declined to rule on the purported ineffectiveness of Brown-Camp's counsel for failing to object on hearsay grounds to the text message Mr. Tyler claimed he received from Mr. Patrick stating that "B-Y" was responsible if anything untoward happened to him. ***See*** PCRA Court Opinion, 9/15/23, at 9 n.4.

## IV. Commonwealth's First PCRA Appeal

The Commonwealth appealed those rulings to this Court, and we disposed of the cases in a single writing that remanded the matters, once again, to the PCRA court. In conducting our analysis, we set forth the relevant legal principles that guided our review both then and continues to do so now:

In every ineffectiveness claim, a petitioner must "rebut the presumption that counsel rendered effective assistance and prove, by a preponderance of the evidence, that (1) the claim has

- 12 -

arguable merit, (2) counsel's action or inaction was not based upon a reasonable trial strategy and (3) petitioner suffered prejudice because of counsel's act or omission." *Commonwealth v. Williams*, 141 A.3d 440, 454 (Pa. 2016) (cleaned up). This three-pronged test was "originally established by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), and adopted by Pennsylvania appellate courts." *Commonwealth v. Wantz*, 84 A.3d 324, 331 (Pa.Super. 2014) (cleaned up). Failing to satisfy any prong of the *Strickland* test is fatal to the ineffectiveness claim. *See Commonwealth v. Thomas*, 323 A.3d 611, 621 (Pa. 2024).

Where the ineffectiveness claim is premised upon counsel's failure to call an expert witness, our Supreme Court has explained the particular modification of these three prongs thusly:

> To satisfy the "arguable merit" prong for a claim of ineffectiveness based upon trial counsel's failure to call an expert witness, the petitioner must prove that an expert witness was willing and available to testify on the subject of the testimony at trial, counsel knew or should have known about the witness, and the defendant was prejudiced by the absence of the testimony. Prejudice in this respect requires the petitioner to show how the uncalled witnesses' testimony would have been beneficial under the circumstances of the case. Therefore, the petitioner's burden is to show that testimony provided by the uncalled witnesses would have been helpful to the defense.
>
> When assessing whether counsel had a reasonable basis for his act or omission, the question is not whether there were other courses of action that counsel could have taken, but whether counsel's decision had any basis reasonably designed to effectuate his client's interest. This cannot be a hindsight evaluation of counsel's performance, but requires an examination of whether counsel made an informed choice, which at the time the decision was made reasonably could have been considered to advance and protect the defendant's interests. Our evaluation of counsel's performance is highly deferential.

- 13 -

> Trial counsel need not introduce expert testimony on his client's behalf if he is able effectively to cross-examine prosecution witnesses and elicit helpful testimony. Additionally, trial counsel will not be deemed ineffective for failing to call a medical, forensic, or scientific expert merely to critically evaluate expert testimony that was presented by the prosecution. Thus, the question becomes whether or not defense counsel effectively cross-examined the Commonwealth's expert witness.
>
> Turning to the prejudice determination, the question is whether there is a reasonable probability that, but for trial counsel's errors, the result of the proceeding would have been different.

**Williams**, 141 A.3d at 460, 463-465 (cleaned up).

> To summarize, there are two prejudice questions a PCRA petitioner must prove to sustain this type of ineffectiveness claim. As in every case alleging ineffectiveness, a petitioner must establish **Strickland** prejudice, *i.e.*, a "reasonable probability" that the result of the proceeding would have been different had counsel called the witness. **Id**. at 465. Additionally, as part of the arguable merit prong, a petitioner must show that the testimony would be helpful.

**Brown-Camp III**, 2025 WL 817162, at *7–8 (ellipses and brackets omitted).

The Commonwealth argued that the PCRA court utilized the wrong prejudice test in granting relief to the co-defendants. We reached the same conclusion, explaining our findings in this way:

> The PCRA court did not author an opinion to accompany its oral order granting relief, and it did not clearly articulate the prejudice test it was using when discussing its findings on the record. Thereafter, in its [Pa.R.A.P.] 1925(a) opinions, the PCRA court framed its prejudice analyses within the context of prejudice as required for the arguable merit prong when the assertion relates to counsel's failure to call a witness. **See** PCRA Court Opinion (Smith), 9/19/23, at 8-9; PCRA Court Opinion (Brown-Camp),

- 14 -

> 9/15/23, at 8. It also incorrectly declined to address the reasonable basis prong in Smith's case because it stated that we remanded solely for the prejudice prong. **See** PCRA Court Opinion (Smith), 9/19/23, at 9. Therefore, we agree that the PCRA court utilized the wrong standard in assessing **Strickland** prejudice in each case and improperly ignored the reasonable basis prong in its Rule 1925(a) opinion in Smith's case.

**Id**. at *9.

Nonetheless, our review of the record revealed that "the court clearly determined, at the time it granted relief, that Smith had proved that Attorney Berardinelli's failure to investigate or call Dr. Collins was not reasonably designed to effectuate his interest." **Id**. at *11 (cleaned up). Therefore, we ultimately rejected the Commonwealth's claim that the PCRA court erred in not considering the reasonable basis prong when granting relief, and affirmed the court's determination that Attorney Berardinelli had failed to act reasonably in not calling Dr. Collins. **Id**. at *11.

Based on the foregoing, we vacated the PCRA orders that had granted relief "and remand[ed] for the PCRA court to analyze, under the proper **Strickland** standard, whether Brown-Camp and Smith proved prejudice on their claims regarding ineffective assistance of trial counsel for not calling an expert witness on the forensic science surrounding Mr. Patrick's time of death." **Id**. at *11. We clarified that "the question before the PCRA court on remand [wa]s whether there [wa]s a reasonable probability that, but for [each attorney's] failure to call Dr. Collins, the result of [their] trial would have been different." **Id**. at *10 (cleaned up). Finally, we ordered the court to reduce

- 15 -

its reasoning to writing in a final order either granting or denying relief as to each co-defendant.

## V.   PCRA Remand for Prejudice Prong

On remand, the court appointed new counsel to represent Smith and provided its analysis of the ***Strickland*** prejudice prong in final orders disposing of the PCRA petitions.  The court first noted the strong cell phone evidence linking Brown-Camp, Smith, and Mr. Patrick together on the evening of April 22, 2013.  Specifically, that evidence established that the three men "traveled together from the State of Delaware to southwest Philadelphia, where [Mr. Patrick's] body was recovered on April 25, 2013.  [Mr. Patrick's] cell phone went off-line the evening of April 22, 2013, while traveling over the Schuylkill River."  PCRA Court Opinion (Brown-Camp), 4/1/25, at 3.

The court then weighed what it deemed to be the strongest remaining trial evidence against Brown-Camp with that cell-phone evidence, and assessed whether the absence of Dr. Collins's testimony prejudiced Brown-Camp, along these lines:

> In addition to the cell phone evidence, the Commonwealth also introduced a statement by [Brown-Camp] to [Ms.] Palmer, who testified that [Brown-Camp] admitted to setting up [Mr. Patrick] to be robbed, that he picked up [Mr. Patrick] in Delaware, and that [Mr. Patrick] had been shot, but not by him.  However, [Ms.] Palmer admitted that she was taking Percocet and Xanax, and had just been released from an inpatient mental health facility and could not remember dates or details she had told the detectives in her statement.  [Ms.] Palmer was then impeached with her prior statement, and the court gave the jury the prior inconsistent

statement charge stating they could use the prior statement substantively.

The Commonwealth also introduced testimony from [Mr.] Baylor. Mr. Baylor testified that in April 2013, he was smoking crack cocaine and using heroin. Mr. Baylor also testified that he suffers from [post-traumatic stress disorder], bipolar disorder, and manic depression, for which he takes a number of medications. Mr. [Baylor] was also convicted of burglary in 2006[,] and violated his term of probation numerous times. Substantively, Mr. Baylor's testimony was largely irrelevant, as he testified that he stopped [Smith] from making what Mr. Baylor expected would be an incriminating statement.

Due to the impeachment evidence against the witnesses, the Commonwealth's evidence at trial was primarily based on the cell phone records placing [the] co-defendant[s] with [Mr. Patrick] on April 22, 2013. However, there was testimony that [Mr. Patrick's] body was in full rigor mortis when he was found on April 25, 2013.

The evidence presented at the April 5, 2023 evidentiary hearing established that Dr. Collins was willing and able to testify at trial that, in his medical opinion, the date of death was April 24th or April 25th, which was even further removed from the evidence placing [Brown-Camp] with [Mr. Patrick] at the time of his death. This would have significantly strengthened the defense's argument that the Commonwealth's evidence failed to prove beyond a reasonable doubt that [Brown-Camp] was involved in [Mr. Patrick's] death. Given that the only other evidence presented at trial outside of the cell phone testimony was through witnesses with significant credibility issues, [the PCRA court found] that [Brown-Camp] proved by a preponderance of the evidence that there is a reasonable probability that, but for trial counsel's errors, the result of the proceeding would have been different. If the jury believed the testimony from the forensic pathologist that the time of death was two to three days after the cell phone evidence placed [Brown-Camp] and his co-defendant with [Mr. Patrick], the additional testimony from the forensic pathologist likely would have changed the jury's mind and resulted in [Brown-Camp's] acquittal.

*Id*. at 3-5 (cleaned up).

In reaching its conclusion that Smith had proved prejudice, the court conducted a practically identical analysis, noting the testimony provided by both Mr. Kearney and Mr. Baylor were subject to bias and impeachment, and therefore the strongest evidence, as with Brown-Camp, was that regarding the proximity of the parties based upon their cell phones' locations on April 22, 2013. *See* PCRA Court Opinion (Smith), 4/1/25, at 3-4.

Based on the foregoing, the PCRA court granted the PCRA petitions of both Smith and Brown-Camp, and ordered new trials.

## VI.   The Present Appeals

The Commonwealth timely filed the instant appeals from the new orders granting PCRA relief.[4]   In this Court, the Commonwealth presents a single,

---

[4] The PCRA court did not order the Commonwealth to submit a concise statement pursuant to Pa.R.A.P. 1925(b) in either case, and none was filed. However, the PCRA court did supply a Rule 1925(a) opinion in support of affirmance as to each co-defendant.

The parties submitted several filings in this Court, with the Commonwealth seeking to consolidate the two appeals, and Brown-Camp (1) opposing consolidation and asking that his case instead be heard by a different panel than Smith's, and (2) requesting that portions of the Commonwealth's brief in the Smith appeal be stricken.   We denied the Commonwealth's motion to consolidate and denied without prejudice Brown-Camp's request for his case to be assigned to another panel.   Upon consideration by this panel, we have chosen to consolidate these cases *sua sponte* into a single writing for ease of disposition in light of the interrelated nature of these cases.

We deferred disposition of Brown-Camp's motion to strike to the panel.   As has been borne out by the above procedural history, we are intimately familiar with the facts underpinning these cases.   Notwithstanding whether Brown-
*(Footnote Continued Next Page)*

identical issue in each case: "Did the [PCRA] court err by granting post-conviction relief on grounds of ineffective assistance of trial counsel for not retaining a forensic pathologist, where defendant was not prejudiced by the omission?" Commonwealth's brief (Smith) at 4; Commonwealth's brief (Brown-Camp) at 4.

## VII. Standard of Review & Relevant Legal Principles

We briefly reiterate the pertinent legal precepts guiding our analysis for both appeals:

> When reviewing an order granting PCRA relief, we must determine whether the decision of the PCRA court is supported by the evidence of record and is free of legal error. Moreover, we will not disturb the findings of the PCRA court unless those findings have no support in the certified record.

**Commonwealth v. Rivera**, 154 A.3d 370, 377 (Pa.Super. 2017) (*en banc*) (cleaned up). "[O]ur scope of review is limited to the findings of the PCRA court and the evidence of record, viewed in the light most favorable to the

_____

Camp has standing to ask this Court to strike portions of an appellant's brief in another matter, we note that just as a trial court in a bench trial, we are limited by the facts of record and are more than capable of ignoring any portion of a brief that is not grounded in fact or which improperly implicates Brown-Camp. **See Commonwealth v. Williams**, 715 A.2d 1101, 1103 (Pa. 1998) ("The fundamental tool for appellate review is the official record of what happened at trial, and appellate courts are limited to considering only those facts that have been duly certified in the record on appeal." (cleaned up)); **Commonwealth v. McFadden**, 156 A.3d 299, 309 (Pa.Super. 2017) ("[A] trial court acting as the fact-finder is presumed to know the law, ignore prejudicial statements, and disregard inadmissible evidence." (cleaned up)). Thus, we deny Brown-Camp's motion to strike portions of the Commonwealth's brief in Smith's appeal.

prevailing party at the trial level[,]" which was the Commonwealth. *Commonwealth v. Burkett*, 5 A.3d 1260, 1267 (Pa.Super. 2010) (cleaned up). Further:

> Success on a claim of ineffective assistance of counsel requires the petitioner to rebut the presumption that counsel rendered effective assistance and prove, by a preponderance of the evidence, that (1) the claim has arguable merit, (2) counsel's action or inaction was not based upon a reasonable trial strategy and (3) petitioner suffered prejudice because of counsel's act or omission.

*Commonwealth v. Williams*, 141 A.3d 440, 454 (Pa. 2016) (cleaned up).

Since the only prong of the co-defendants' ineffectiveness claims that is before us in these appeals is the prejudice prong, the salient "question is whether there is a reasonable probability that, but for [each] trial counsel's errors, the result of the proceeding would have been different." *Id*. at 465 (cleaned up). Our High Court has clarified that "[t]his does not mean a different outcome would have been more likely than not; a reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. Still, a speculative or attenuated possibility of a different outcome is insufficient to undermine confidence in the outcome." *Commonwealth v. Jones*, 210 A.3d 1014, 1019 (Pa. 2019) (cleaned up).

Finally, the *Strickland* Court offered the following additional instruction regarding the scope of a PCRA court's review when assessing whether a petitioner has proved prejudice:

> In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge

or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

*Strickland*, 466 U.S. at 695–96.

## VIII. *Strickland* Prejudice in Smith's Case

We begin with the Commonwealth's appeal in Smith's case. At large, the Commonwealth contests the PCRA court's consideration of the evidence produced at trial in finding prejudice as to Smith. To wit, it alleges that the court failed to reckon with the statement of Mr. Cummings, to whom Smith had confessed to murdering Mr. Patrick, and who otherwise provided corroborating evidence to the other witnesses' accounts of what happened on April 22, 2013. **See** Commonwealth's brief (Smith) at 35-36. The Commonwealth also contends that the PCRA court mischaracterized and inadequately weighed Mr. Kearney's testimony, and ignored the possibility that his pending federal matters could have been interpreted by the jury as increasing the likelihood of him telling the truth, instead of serving to impeach his credibility. *Id*. at 37-39. Further, it maintains that Mr. Baylor's testimony was more relevant than the court acknowledged. *Id*. at 39. Specifically, the

- 21 -

Commonwealth insists that the court failed to view Smith's statement to Mr.

Baylor about the .22 caliber bullet in its proper context, explaining in this

fashion:

> First, [Mr.] Patrick was shot nine times **with a .22 caliber gun**. Second, this conversation occurred in the context of defendant asking Baylor what it was like to kill a person.  The combination of showing Baylor a .22 caliber bullet and telling him "I did that," in the context of a conversation about killing, is strong circumstantial evidence that defendant Smith did, indeed, do that.

*Id*. (cleaned up, emphasis in original).

As further background relating to the Commonwealth's claims, Mr.

Kearney testified that Smith was concerned about the text message Mr.

Patrick sent to Mr. Tyler about "B-Y," and how it could implicate him.  *See*

N.T. Jury Trial, 2/24/17 (morning), at 141, 148-49.  Additionally, Smith

admitted to Mr. Kearney that he had set up Mr. Patrick for a robbery and then

shot Mr. Patrick in the head a few times when he tried to run away.  *Id*. at

143-44.  According to Mr. Kearney's testimony, Brown-Camp never provided

any such confession to him, but would laugh whenever Smith talked about

shooting Mr. Patrick.  *See* N.T. Jury Trial, 2/24/17 (morning), at 150-51.  Mr.

Kearney was adamant that although his police statement indicated that "they"

had both told him about the murder, his use of "they" when speaking to police

referred only to Smith.  *Id*. at 152; N.T. Jury Trial, 2/24/17 (afternoon), at

21.

Our review of the certified record bears out that the evidence against

Smith established not only that he was with Brown-Camp and Mr. Patrick on

April 22, but also that Smith boasted time and again that he shot Mr. Patrick to death. He told Mr. Cummings that he killed Mr. Patrick. Smith also confessed to Mr. Kearney that he shot Mr. Patrick in the head when he tried to run away during the robbery and would joke about it in his presence. Moreover, he showed Mr. Baylor a .22 caliber bullet, which was the caliber of bullet recovered from Mr. Patrick's body, and told him "I did that," after a conversation about what it felt like to kill someone. Finally, Mr. Patrick's body was recovered from an abandoned home that Smith's cousin also utilized.

Hence, the addition of Dr. Collins's testimony about a later date of death would not conflict with Smith repeatedly declaring that he shot Mr. Patrick nor meaningfully diminish the quantum of evidence connecting him to the murder. The jurors could conclude that Smith killed Mr. Patrick on a later date, consistent with the standard range for rigor mortis and Smith's confessions, or they could deduce that Smith shot Mr. Patrick on April 22 around the time that Mr. Patrick's phone went offline, and the environmental conditions were such that rigor mortis did not follow its usual schedule.

Phrased differently, in light of the incredibly damning evidence against Smith, the unlikelihood of Mr. Patrick's death occurring on April 22 based upon it being inconsistent with the normal rigor mortis timetable would "have had an isolated, trivial effect." **Strickland**, 466 U.S. at 696; **Id**. ("[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.").

Thus, we agree with the Commonwealth that the PCRA court erred in determining that Smith suffered prejudice based upon the failure to call Dr. Collins. Since we conclude that Smith failed to prove prejudice on his ineffectiveness claim, we reverse the PCRA court's order granting his petition.

## IX. *Strickland* Prejudice in Brown-Camp's Case

We now turn to the Commonwealth's appeal in Brown-Camp's case. It again argues that the PCRA court erred by not including certain pieces of trial evidence within its prejudice analysis. Specifically, it assails the court's failure to address the text message Mr. Patrick sent to Mr. Tyler on April 22, as well as Mr. Kearney's related testimony. *See* Commonwealth's brief (Brown-Camp) at 45-46. Since the text message had not been deemed inadmissible by any formal ruling, the Commonwealth insists that it was "part of the totality of the evidence that must be considered when conducting the prejudice analysis." Commonwealth's reply brief (Brown-Camp) at 12 n.5. Similarly, it alleges that the PCRA court "erroneously concluded that [Ms.] Palmer's trial testimony was unreliable[.]" Commonwealth's brief (Brown-Camp) at 43.

The Commonwealth also laments the PCRA court's simplification of Dr. Collins's testimony in which he had conceded that, while it was highly unlikely that Mr. Patrick died on April 22, it was not impossible. *Id*. at 50. Furthermore, it contends that the PCRA court did not credit Dr. Chu's testimony, which had explained that notwithstanding the difficulties of precise dating, Mr. Patrick could have died on April 22. *Id*. at 50-51. It maintains

that Brown-Camp had put forth a challenge to the date of death at trial based upon the length of time that Dr. Chu testified rigor usually lasts, and therefore the argument "had already been fully presented to the jury." *Id*. at 51. In sum, the Commonwealth concludes that the court erred because "both experts could not rule out the Commonwealth's theory of the case, that [Mr. Patrick] died on April 22, 2013." *Id*. at 53 (emphasis in original).

At the outset, we observe that the Commonwealth's argument rests upon a misapplication of the prejudice standard. Brown-Camp did not need to disprove the Commonwealth's theory of the case to prove a reasonable likelihood that the outcome would have been different. Instead, he must have demonstrated that had counsel not erred, there would have been reasonable doubt in some of the jurors' minds as to whether he was guilty of third-degree murder.

Nonetheless, we agree with the Commonwealth that we do not adjudge prejudice on a diminished record because, as with a challenge to the sufficiency of the evidence to sustain a conviction, our review requires us to consider the PCRA court's factual findings and "the evidence of record, viewed in the light most favorable to the prevailing party at the trial level." *Burkett*, 5 A.3d at 1267 (cleaned up). Moreover, when the PCRA court considers whether a petitioner has proved prejudice for an ineffectiveness claim, it must do so upon the totality of the evidence presented to the jury, "[t]aking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings[.]" *Strickland*, 466 U.S. at 696.

While the court must conduct such an analysis and therefore should have included such evidence as the text message in its consideration, the PCRA court need not detail in its writing every piece of evidence proffered during a murder trial. Indeed, the PCRA court explained that it was not providing a full accounting of the evidence presented at trial because the evidence has been discussed *ad nauseum* by this Court, the trial court, and the PCRA court over the last six years. *See* PCRA Court Opinion (Brown-Camp), 5/1/25, at 3 n.1. Instead, it focused upon what it deemed the Commonwealth's strongest evidence.

However, our review reveals that the court's finding of ***Strickland*** prejudice cannot be supported by the trial record. As recounted at length hereinabove, the evidence presented to the jury painted a clear picture of: (1) Brown-Camp setting up Mr. Patrick to be robbed by Brown-Camp and Smith; (2) the three being together on the evening of April 22; and (3), when Mr. Patrick tried to foil the planned robbery and run away, Smith shot him to death. Brown-Camp admitted to setting up Mr. Patrick for the robbery and being present for the shooting. He merely claimed that he was not the one who pulled the trigger. Finally, Mr. Patrick alerted two different individuals that if anything happened to him, Brown-Camp was responsible.

As with Smith, the introduction of Dr. Collins's testimony about the usual parameters of rigor mortis could only "have had an isolated, trivial effect" upon the exhaustively inculpatory evidence adduced during the four-day murder trial against Brown-Camp. ***Strickland***, 466 U.S. at 696; ***Id***. ("[A]

- 26 -

verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."). Accordingly, we also reverse the PCRA court's order granting Brown-Camp relief because he failed to prove prejudice.

In doing so, we note that the PCRA court, despite holding a hearing as previously directed by this Court, has not yet ruled on Brown-Camp's PCRA claim that trial counsel rendered ineffective assistance in failing to raise a hearsay objection to the text message Mr. Patrick sent to Mr. Tyler implicating Brown-Camp. Thus, we remand solely for the PCRA court to enter a final order as to whether Brown-Camp is entitled to PCRA relief based upon that ineffectiveness claim.

## X. Conclusion

Based on the foregoing, we reverse the PCRA court's orders granting relief to Smith and Brown-Camp, remand with instructions to the PCRA court in Brown-Camp's case, and reinstate Smith's judgment of sentence.

PCRA order granting relief to Brown-Camp reversed. Case remanded with instructions.

PCRA order granting relief to Smith reversed.

Jurisdiction as to both cases relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 3/2/2026